# United States Court of Appeals
## For the First Circuit

No. 16-1492

MARK W. EVES,

Plaintiff, Appellant,

v.

PAUL R. LEPAGE,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE
[Hon. George Z. Singal, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella, Stahl, Lynch, Thompson, Kayatta*, and Barron,
Circuit Judges.

David G. Webbert, with whom Carol J. Garvan and Johnson, Webbert & Young, LLP were on brief, for appellant.
Patrick Strawbridge, with whom Bryan K. Weir, Caroline A. Cook, and Consovoy McCarthy Park PLLC were on brief, for appellee.

Opinion En Banc

June 19, 2019

---

*  Judge Kayatta is recused and did not participate in consideration of this matter.

**LYNCH**, **Circuit Judge**.   This court took this case en banc, which then caused the withdrawal of the panel opinion, Eves v. LePage, 842 F.3d 133 (1st Cir. 2016), while we reconsidered the case.   A divided panel there had affirmed the district court's dismissal of this First Amendment retaliation suit brought by the then-Speaker of Maine's House of Representatives, Mark Eves, against the then-Governor of Maine, Paul LePage.[1]   Eves alleged that, while governor, LePage leveraged discretionary state funding, in a yet unpassed state budget, to coerce an organization, Good Will-Hinckley ("GWH"), to terminate Eves's upcoming employment as its President.

In his en banc petition, Eves has narrowed his legal claims by dropping all damages claims for the alleged violation of his free speech rights by LePage.   Eves continues to pursue damages against LePage for his claim of political affiliation discrimination, which is now the only damages claim before us.

The en banc court holds that LePage, on these unique facts, is entitled to qualified immunity because a reasonable governor in LePage's situation could have believed Eves's position as the new President of GWH to be a policymaking position for which political affiliation was relevant.   We do not reach LePage's

---

[1]     LePage left office on January 2, 2019, and Eves left office on December 2, 2016.   We nonetheless generally refer to them as Governor LePage and Speaker Eves.

arguments that he is also entitled to immunity on other grounds. We also reinstate in part our prior panel opinion and affirm the dismissal of this action.

**I.**

**Background**

The qualified immunity issues presented in this case are ultimately issues of law, which receive de novo review. Elder v. Holloway, 510 U.S. 510, 516 (1994). Like the district court, we assume the truth of the complaint's well-pleaded facts and draw all reasonable inferences in Eves's favor.[2] See Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009); Feliciano-Hernández v. Pereira-Castillo, 663 F.3d 527, 532 (1st Cir. 2011) (quoting New York v. Amgen Inc., 652 F.3d 103, 109 (1st Cir. 2011)).

A. Maine's Government and Budget Process

We begin with background information on Maine law as of June 2015, the time of the events in this case, and other facts as found by the district court.

---

[2] We consider Eves's Second Amended complaint ("the complaint"), documents annexed to it, materials fairly incorporated within the complaint, and Maine state law, which is subject to judicial notice. See Rodi v. S. New Eng. Sch. of Law, 389 F.3d 5, 12 (1st Cir. 2004). We do not consider materials not in the complaint, which the district court held could not be properly considered. Eves has not appealed from that portion of the district court's decision and has waived any argument on the issue.

Serving in the Maine Legislature is not a full-time job for most representatives. The legislature typically sits twice in each session: once from December to June in year one, then again from January to April in year two. See Me. Rev. Stat. Ann. ("M.R.S.A.") tit. 3, § 2. A legislator's salary was $24,056, spread over the two years, plus a $38 per diem, when the legislature was active, "for housing or mileage and tolls." Eves v. LePage, No. 1:15-cv-300, 2016 WL 1948869, at *2 (D. Me. May 3, 2016). Most legislators have at least one other source of income, often in the private sector. Id. In fact, "[n]early all legislators depend on a career outside of the State House to provide for their families." Id. at *5 (relaying statement by Maine Senate President Mike Thibodeau).

Maine's biennial budget process starts when the Department of Administrative and Financial Services "prepare[s] and submit[s] . . . a state budget document" to the governor, having considered submissions from various agencies and policy committees. M.R.S.A. tit. 5, § 1662. The governor then reviews the draft budget, alters it, and sends it to the legislature before the statutory deadline "in January of the first regular legislative session." Id. § 1666. The legislature must "enact a budget no later than 30 days prior to the date of adjournment prescribed" by law. Id. § 1666-A. The legislature's proposed budget then returns to the governor, who has line-item veto power, permitting

- 4 -

him to reduce "any dollar amount" in the budget. Me. Const. art. IV, pt. 3, § 2-A. The legislature can override any such line-item vetoes with a simple majority of both the House and the Senate. Id. The governor can also veto the entire budget, like any other piece of legislation, in which case a two-thirds majority of both the House and Senate is necessary to override the veto. Id. art. IV, pt. 3, § 2.

The events in this case, which occurred mostly in June 2015, arose in the midst of the biennial budget process and involved serious political conflict between Governor LePage and the legislature. The complaint sets forth reports from others about statements LePage made about Speaker Eves. Those statements, which are at the heart of this case, occurred on June 5, June 8, and June 9, before the legislature had passed any budget. The complaint also sets forth allegations about later statements by LePage on June 29, July 7, and July 30 as to his reasons for his actions.

In a press conference on May 29, 2015, LePage stated that he planned to veto "every bill sponsored by a Democrat" for the rest of his term in office "unless the Legislature agreed to support his plan to have a referendum vote on eliminating Maine's income tax." Eves, 2016 WL 1948869, at *4. LePage did, in fact, veto ten bills on June 8, 2015, stating that he had done so purely because of their Democratic sponsorship.

After the legislature passed a budget on June 17, 2015, LePage issued sixty-four line-item vetoes, each of which the legislature overrode on June 18 and 19, 2015. On June 29, 2015, LePage vetoed the entire budget. The legislature also overrode that veto on June 30, enacting the budget for fiscal years 2016 and 2017 into law. The enacted budget included discretionary funding for GWH, which was disbursed to GWH after Speaker Eves's contract with GWH was terminated.

B.  Good Will-Hinckley, The Center of Excellence for At-risk Students ("the Center"), and The Maine Academy of Natural Sciences ("MeANS")

GWH is a nonprofit charitable organization, which serves a public purpose, located in Fairfield, Maine. The nonprofit aims to provide services to at-risk children throughout the state. Founded in 1889 as a "farm, school and home for needy boys," GWH now has a broader mission and a portfolio encompassing a "college step-up program," a "Learning Center for youth with emotional or behavioral challenges," a nutrition program, a library, and a museum. Id. at *2. The organization has long depended on both private donations and government grants.

GWH was designated by the Maine Legislature in 2009 "to serve as the nonprofit charitable corporation with a public purpose to implement the Center of Excellence for At-risk Students," a statutorily-established public entity. Id. at *3; see 2009 Me. Legis. Serv. Ch. 296 (West) (codified at M.R.S.A. tit. 20-A,

- 6 -

§§ 6951-54). The legislature gave the governor discretion to fund the Center. See M.R.S.A. tit. 20-A, § 15689-A.20. In order to implement the Center, GWH opened a charter school in 2012, called the Maine Academy of Natural Sciences ("MeANS"), which it continues to operate. Eves's counsel conceded at oral argument that the operation of MeANS is the only way in which the Center has been implemented.

The complaint is silent as to whether MeANS is considered a "public" charter school and whether state funding intended for MeANS is simply passed on from GWH to MeANS as such. The complaint contains no allegations as to the exact legal relationship between the Center, MeANS, and GWH, and no allegations as to any contracts between them. Nor has Eves appended to the complaint any such contracts, nor quoted from them. However, three things are clear: (1) although MeANS has its own board and principal, the school relies on "discretionary state funding pursuant to its [statutory] designation as 'the Center for Excellence for At-risk Students,'" Eves, 2016 WL 1948869, at *3 (citing M.R.S.A. tit. 20-A, § 15689-A.20); (2) GWH fulfills its public function of implementing the Center only by administering MeANS, see 2009 Me. Legis. Serv. Ch. 296, § 2; and (3) the Center is, by legislative designation, a public entity, see id.

The Maine state budget for fiscal years 2014 and 2015 -- which covered the period from July 1, 2013 to June 30, 2015 --

- 7 -

had allocated $1,060,000 in discretionary funding to GWH for the purpose of operating MeANS. Governor LePage disbursed all of the discretionary funding in that period; however, during that period, GWH was under a different President: first, Glenn Cummings, who was himself a former Speaker of the Maine House and a Democrat, and then under an interim President, Richard Abramson. The 2015–2017 budget under debate in spring 2015 contained a discretionary appropriation of $1,060,000 to GWH to be paid in quarterly installments, as in previous years.

C.   Selection of Speaker Eves as President of GWH

GWH began searching for a successor after Glenn Cummings resigned as President of GWH in September 2014. Eves, who was then Speaker of the Maine House, was one of the nineteen applicants.[3]

GWH's eight-member search committee interviewed Eves on April 24, 2015. He visited the campus as one of three finalists, and on April 30, the GWH Senior Leadership Team unanimously recommended him as the best of the three. The Team's memo "cited his 'extensive clinical experience,' his 'balance of executive administration and fundraising experience,' and his 'leadership

---

[3]      Eves had served as a representative in the House since 2008, and was Speaker for four terms from 2012 to 2016. Eves also had fifteen years of professional experience in behavioral health and family therapy, in both clinical and administrative roles. Since moving from Kentucky to Maine in 2003, Eves worked in that field, even while serving in the legislature.

style and polished approach' as reasons" for their conclusion. Eves, 2016 WL 1948869, at *3. After Eves interviewed with the full boards of GWH and MeANS on May 15, GWH's Board voted unanimously to offer him the job of GWH President.

On June 5, 2015, Eves, who was then still the Speaker of the Maine House, entered into a two-year employment agreement with GWH, beginning on July 1, 2015. Id. at *4. That agreement contained a "for-cause termination provision," and "no conditions or contingencies" related to any actions or funding decisions by the State. Id. Most of Eves's employment at GWH would overlap with his final term as Speaker. GWH announced Eves as its new President on June 9.

D.    Governor LePage's Intervention

On June 5, Governor LePage learned that GWH had decided to hire Speaker Eves and promptly called GWH's interim President. Id. According to the complaint, LePage stated "that he was extremely upset" about the news and "used profanity to describe [Speaker Eves] and his work." That same day or "soon after," LePage also sent a handwritten note to GWH's Board Chair, which, as characterized in the complaint, "referred very negatively to Speaker Eves" and called him a "hack." This note was not appended to the complaint. The Board Chair's belief, after reading the note, was "that GWH would lose $1,060,000 in [discretionary] state funding if it retained Eves as its new President." Id.

- 9 -

On June 8, Governor LePage "sent a public letter to the Board Chairs of GWH and MeANS, urging that they reconsider." Id. According to the complaint, the letter characterized Eves as "a longtime opponent of public charter schools" who had fought against "every effort to reform Maine's government." Id. This letter was also not appended to the complaint.

The GWH Board, "which includes people of various political affiliations," discussed the letter and "agreed that their selection of Speaker Eves [had been] well-supported and . . . not based on political considerations." Id.

On June 8, LePage also received a call from Gregory Powell, the Chairman of the Board of Trustees of the Harold Alfond Foundation ("the Foundation"), who was responding to a June 5 voicemail from LePage. The complaint alleges Powell was left with the impression that LePage was "withdrawing all support," including financial support, from GWH as long as Eves remained as President of the organization. The complaint alleges that Powell responded to the news by sending a letter to GWH's Board on June 18, warning them that the Foundation had "serious concern[s] . . . regarding [GWH's] future financial viability" if LePage were to follow through on his threat to withhold the $1,060,000 in discretionary state funding. Those concerns, Powell further warned, made the Foundation uneasy about committing to a $2,750,000

grant that the Foundation had been planning to give to GWH. Powell's letter was not appended to the complaint.

On or about June 9, the complaint alleges Governor LePage told the Acting Commissioner of the Department of Education not to send any more payments to GWH "that [were] not required by law." The Commissioner, in response, froze $132,500 in discretionary funding that was scheduled to be sent to GWH at the beginning of the next quarter (on July 1), assuming the enacted budget contained an appropriation of those funds. As of June 9, the legislature had not yet passed the budget or appropriated any funding for GWH. It would have been a violation of Maine law to have sent the $132,500 to GWH before the budget was final and enacted. See M.R.S.A. tit. 5, § 1543.

The lawyers for Eves and Governor LePage spoke on June 22. Eves's lawyer asked LePage to withdraw his threats, but LePage refused to change his stance. However, LePage took no further steps "to reduce or eliminate the $1,060,000 in discretionary funds allotted in the proposed state budget for GWH." Eves, 2016 WL 1948869, at *5.

After that conversation between the attorneys, GWH terminated Speaker Eves's employment contract on June 24, one week before his planned July 1 start date. Eves was Speaker of the Maine House at the time. Eves immediately stated publicly that "his firing was caused by LePage's threat to withhold funding."

- 11 -

Id. Months later, on October 15, GWH's Board Chair stated in a legislative hearing that Eves's employment would not have been terminated but for Governor LePage's intervention. Some of Eves's colleagues in the legislature also spoke out. State Senate President Mike Thibodeau, a Republican, publicly stated that he was "very saddened by this situation and shocked by what is being alleged. Nearly all legislators depend on a career outside of the State House to provide for their families." Id.

Initially, Governor LePage declined to confirm or deny that he had made any statement to influence GWH's decision-making process. However, as the complaint alleges, when local reporters interviewed LePage on June 29 and asked whether he had "threatened to withhold money" from GWH, he responded:

> Yeah, I did! If I could, I would! Absolutely; why wouldn't I? Tell me why I wouldn't take the taxpayer money, to prevent somebody to go into a school and destroy it. Because his heart's not into doing the right thing for Maine people.

In a radio address on July 7, LePage further explained:

> [Eves] worked his entire political career to oppose and threaten charter schools in Maine. He is the mouthpiece for the Maine Education Association. Giving taxpayers' money to a person who has fought so hard against charter schools would be unconscionable.

And in another interview on July 30, LePage called Eves "a plant by the unions to destroy charter schools." LePage drew an analogy: "[O]ne time I stepped in . . . when a man was beating his wife.

- 12 -

Should I have stepped in?  Legally, no.  But I did.  And I'm not embarrassed about doing it."

E.    Procedural History of This Litigation

Eves filed this lawsuit on July 30, 2015, and then filed a First Amended Complaint on December 18, 2015.  Governor LePage moved to dismiss the suit on January 5, 2016, arguing in his supporting memo that the complaint failed to state any claim and that the subject matter of the lawsuit was "a political dispute that does not belong in court."  He explicitly asserted, inter alia, that his actions as to Eves were protected by both absolute and qualified immunity.  On April 13, 2016, Eves was granted leave (without opposition) to file a Second Amended Complaint.[4]

On May 3, 2016, the district court issued an opinion granting Governor LePage's motion to dismiss.  <u>Eves</u>, 2016 WL 1948869, at *1.  The court entered judgment for LePage the next day, and Eves filed a notice of appeal that same day.

---

[4]    The Second Amended Complaint contained five claims against Governor LePage: four federal law counts under 42 U.S.C. § 1983 for violations of Eves's rights to political affiliation, free speech, freedom of association, and procedural due process, and a fifth claim under state law for intentional interference with contract.  As relief, Eves requested: (1) a declaratory judgment; (2) an injunction compelling Governor LePage to "permanently withdraw his illegal threat" to GWH and "cease using his authority to illegally retaliate against Eves or private organizations that are prospective employers or employers of Eves"; and (3) damages.

- 13 -

On November 22, 2016, a divided panel of this court affirmed the district court's dismissal of Eves's equitable claims, and dismissed his § 1983 damages claims on the basis of qualified immunity. Eves, 842 F.3d at 144-45. It also directed the district court to dismiss Eves's state law claim without prejudice. Id. at 146. Eves petitioned for rehearing en banc, and his petition was granted on January 19, 2018.

Eves has narrowed his claims for en banc review. The conduct by Governor LePage he is now challenging is limited to LePage's alleged threat to withhold discretionary funding, and the stop order that was placed, before the budget was finalized, on GWH's first quarterly payment for fiscal year 2015. Eves is no longer pursuing damages for his free speech claim, but continues to pursue damages for political affiliation discrimination. Eves is also still pursuing equitable relief, especially declaratory relief.

**II.**

## We Hold that Qualified Immunity Bars Eves's Claim for Damages for Political Affiliation Discrimination

A.   Qualified Immunity Framework

The Supreme Court has long established that, when sued in their official capacities, government officials are immune from damages claims unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct

was 'clearly established at the time.'" District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)). The second step of the qualified immunity inquiry, in turn, involves several factors.

The plaintiff must demonstrate that "the law was '"sufficiently clear" [such] that every "reasonable official would understand that what he is doing" is unlawful.'" Id. at 589 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)). The Supreme Court has "repeatedly told courts" not to define the qualified immunity inquiry "at a high level of generality." City & Cty. of S.F. v. Sheehan, 135 S. Ct. 1765, 1775-76 (2015) (quoting al-Kidd, 563 U.S. at 742). Rather, clearly established law must define "the right allegedly violated . . . in a 'particularized' sense so that the 'contours' of the right are clear to a reasonable official." Reichle, 566 U.S. at 665 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

Qualified immunity, the Court has reinforced, is intended to "protect[] 'all but the plainly incompetent or those who knowingly violate the law.'" White v. Pauly, 137 S. Ct. 548, 551 (2017) (quoting Mullenix v. Luna, 136 S. Ct. 305, 308 (2015)). Accordingly, although there need not be "a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." al-Kidd, 563 U.S. at 741. The Supreme Court has "not yet decided what precedents -- other

than [its] own -- qualify as controlling authority." Wesby, 138 S. Ct. at 591 n.8. It is enough "for qualified immunity purposes" though that under existing Supreme Court case law, it is "at least arguable" that LePage's actions were constitutional. Reichle, 566 U.S. at 669.

The Supreme Court has also repeatedly emphasized that the qualified immunity inquiry "focus[es] on 'the objective legal reasonableness of an official's acts.'" Crawford-El v. Britton, 523 U.S. 574, 590 (1998) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982)). "Evidence concerning the defendant's subjective intent is simply irrelevant" to the second step of the inquiry. Id. at 588. As such, if an objectively reasonable official in Governor LePage's shoes "might not have known for certain that [his] conduct was unlawful," then LePage "is immune from liability." Ziglar v. Abbasi, 137 S. Ct. 1843, 1867 (2017). A decision of qualified immunity on a motion to dismiss is appropriate here.[5]

---

[5] We reject Eves's contention that qualified immunity should be decided at a later stage of litigation, not on a motion to dismiss. That would turn well-settled precedent on its head. The Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage [of the] litigation." Wood v. Moss, 572 U.S. 744, 755 n.4 (2014) (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam)). The Court has affirmed the dismissal of multiple First Amendment claims on the basis of qualified immunity. See, e.g., Ziglar, 137 S. Ct. at 1869; Wood, 572 U.S. at 756-64; Iqbal, 556 U.S. at 686. We have as well. See, e.g., Air Sunshine, Inc. v. Carl, 663 F.3d 27, 32-37 (1st Cir. 2011); Decotiis v. Whittemore, 635 F.3d 22,

- 16 -

B.    Qualified Immunity Analysis

We move directly to the second step of the qualified immunity analysis and ask whether Governor LePage's alleged conduct violated "clearly established" federal law as to political affiliation discrimination.  Applying this objective test, we conclude that the law on which Eves relies was not clearly established such that a reasonable governor in LePage's situation would have concluded that the constitutional question and the policymaker exception was placed beyond doubt in Eves's favor.[6] There was no "controlling authority" or even a "consensus of cases of persuasive authority," Wilson v. Layne, 526 U.S. 603, 617 (1999), that would lead to the conclusion that Governor LePage can be denied immunity.

Even if we were to assume that Governor LePage induced GWH to remove Eves solely because Eves was a Democrat -- and not, even in part, because of LePage's view of Eves's policy positions[7]

36-38 (1st Cir. 2011); Torres-Rivera v. Calderón-Serra, 412 F.3d 205, 214-15 (1st Cir. 2005).

[6]    Eves argues that because political discrimination cases often involve "a calculated decision," and not a split-second judgment call as in some Fourth Amendment cases, a less-protective standard of qualified immunity should apply.  He cites no law to that effect, and we know of none.  As a matter of fact, the inferences from the complaint are that LePage was under some time pressure to act (if not a split-second decision), and there were at least two reasons for that: (1) the budget was in the process of being decided on within days, and (2) the date of Eves's appointment was looming.

[7]    We reiterate that the complaint expressly alleges that

-- for the reasons that follow, LePage could have reasonably believed that the President of GWH was a "policymaker" who could be lawfully discharged on the basis of his political affiliation.[8]

The Supreme Court has long held, beginning with Elrod v. Burns, 427 U.S. 347 (1976) (plurality opinion), and Branti v. Finkel, 445 U.S. 507 (1980), that there is no right to protection on the grounds of political affiliation where political affiliation is legitimately relevant to the employee's job. This court has extended the "policymaker exception," in certain circumstances, beyond public offices to nongovernment employees. See Ramírez v. Arlequín, 447 F.3d 19, 23 (1st Cir. 2006); Prisma Zona Exploratoria de Puerto Rico, Inc. v. Calderón, 310 F.3d 1, 3, 8 (1st Cir. 2002).

In Elrod, a plurality of the Supreme Court specifically noted that consideration of political affiliation for policymaking positions is justified to prevent "representative government" from being "undercut by tactics obstructing the implementation of

---

LePage communicated his intent to oppose further discretionary funding for GWH unless it removed Eves, because Eves was thought by LePage to be beholden to unions, to oppose charter schools, and to seek to undercut the mission of MeANS.

[8] LePage did not waive the argument that he is entitled to qualified immunity even if he committed a reasonable mistake of law. "The purpose of qualified immunity is to protect reasonable, if mistaken, decision making by government officials" when the law is unclear. López-Quiñones v. P.R. Nat'l Guard, 526 F.3d 23, 27 (1st Cir. 2008) (citation omitted). As such, it is sufficient that LePage argued the law was not clearly established as to whether the President of GWH is a policymaking position.

policies of the . . . administration, policies presumably sanctioned by the electorate." 427 U.S. at 367. Elrod also recognized that "[n]o clear line can be drawn between policymaking and nonpolicymaking positions." Id. Rather, "[t]he nature of the responsibilities [of the position] is critical." Id.

Branti reaffirmed that consideration of political affiliation is permissible where "affiliation is an appropriate requirement for the effective performance of the public office involved."[9] 445 U.S. at 518 (emphasis added). There, the Court held that two county assistant public defenders, who the lower courts had found were terminated solely because they were Republicans, had a viable First Amendment claim against the newly elected public defender. Branti, 445 U.S. at 520. Quoting Elrod in part, the Court reasoned that the assistant public defenders were not policymakers subject to political discharge because they had "'very limited, if any, responsibility' with respect to the overall operation of the public defender's office.' They [also] did not 'act as advisors or formulate plans for the implementation of the broad goals of the office.'" Id. at 511 (quoting Finkel v. Branti, 457 F. Supp. 1284, 1291 (S.D.N.Y. 1978)).

---

[9] A later case extended Branti and Elrod's protections to employment decisions other than discharge for what were low-level employees. See Rutan v. Republican Party of Ill., 497 U.S. 62, 79 (1990). Rutan would not have provided any notice to LePage that his actions were unconstitutional. No claim was made there that such employees held policymaking positions.

- 19 -

Here, the President of GWH can be reasonably understood to be a policymaker given GWH's statutory mandate to administer a public entity, the Center for Excellence of At-risk Students, and its choice to do so solely through MeANS. President was the highest position at GWH. Further, the job description, as set forth in the complaint, could lead a reasonable governor to conclude that the position involved "act[ing] as an adviser" and "formulat[ing] plans for the implementation" of the Center. Branti, 445 U.S. at 511. The job qualifications emphasized "administrative experience in strategic planning . . . and experience working with legislators, state policy makers, and governmental agencies." (Emphasis added.)

Indeed, the complaint itself alleges that Eves was selected specifically for his "statewide policy and leadership experience as Speaker of the Maine House of Representatives." Coupled with the fact that the previous GWH President had also been the Speaker of the Maine House, this could lead a reasonable governor to conclude that policymaking, including working with elected policymakers, was an important aspect of the GWH President's job.

A reasonable governor could also conclude that the President of GWH was "in a position to thwart" the policy objectives of "the in-party." Elrod, 427 U.S. at 367. In carrying out its public function, GWH is mandated by statute to

"collaborate with the department [of education], public school administrators and other public and private organizations with an interest in the support and education of at-risk students." M.R.S.A. tit. 20-A, § 6952. Given that there is clearly room for principled and partisan disagreement about how best to administer MeANS and collaborate with various stakeholders, a reasonable governor could conclude that "[political] affiliation is an appropriate requirement" for the position of GWH President. Branti, 445 U.S. at 518. In fact, Governor LePage articulated this exact concern, as evidenced by allegations in the complaint that LePage stated Eves would use his office to oppose LePage's agenda of promoting charter schools and to promote policies favored by the teachers' union.

Further, the fact that GWH's funding for MeANS is left entirely to the governor's discretion is yet another reason why a reasonable governor could have believed that the President of GWH was an important policymaking position. The legislature specified that the discretionary state funding GWH receives to implement the Center is expressly subject to the satisfaction of the Commissioner of Education (and by extension, the governor). See M.R.S.A. tit. 20-A, § 15689-A.20. This suggests that the operation of MeANS is a public function closely tied to the "implementation of policies of [LePage's] administration." Elrod, 427 U.S. at 367. And a reasonable governor could have believed that a significant reason

the funding of the Center was left to whoever was the occupant of the governor's job was to ensure that, in implementing the Center, GWH would follow that administration's educational policy directives.

Turning to First Circuit law interpreting the policymaker exception, we reach the same qualified immunity outcome. Our circuit precedent has consistently held that positions of far less responsibility and significance than that of the President of GWH were policymaking positions. See O'Connell v. Marrero-Recio, 724 F.3d 117, 120 (1st Cir. 2013) (human resources director of agency); Uphoff Figueroa v. Alejandro, 597 F.3d 423, 426 (1st Cir. 2010) (administrator of agency's legal office); Flynn v. City of Bos., 140 F.3d 42, 45 (1st Cir. 1998) ("the regional director of an administrative agency, the municipal secretary in a mayor's office, an officer in charge of human resources, a director of public relations, a superintendent of public works, a director of a city's federal programs office, and a director of a satellite office of the Massachusetts Secretary of State" (citations omitted)); Roman Melendez v. Inclan, 826 F.2d 130, 133-34 (1st Cir. 1987) (regional director of agency in charge of maintaining public buildings).[10] Further, we have held that

---

[10] Roman Melendez in turn cited to eight First Circuit cases:

> [I]n every case concerning regional directors of government agencies in Puerto Rico, we have

- 22 -

"the government's policymaking interest [can] override the First Amendment protection against political discrimination, even where the plaintiff [is] not a government employee." Ramírez, 447 F.3d at 23.

A governor could reasonably have thought that the President of GWH was a position to which the policymaker exception applied based on our decision in Prisma Zona, 310 F.3d 1. There, this court applied the policymaker exception to a private organization to dismiss its First Amendment claim on the merits.

concluded, at least for purposes of granting qualified immunity, that a regional director was, in fact, a policymaker. See Echevarria v. Gracia-Anselmi, 823 F.2d 696 (1st Cir. 1987) (regional director of the Right to Employment Administration); Perez Quintana v. Gracia Anselmi, 817 F.2d 891 (1st Cir. 1987) (regional director of the Right to Employment Administration); Rafucci Alvarado v. Zayas, 816 F.2d 818 (1st Cir. 1987) (regional director of the Department of Social Services); Alicea Rosado v. Zayas, 813 F.2d 1263 (1st Cir. 1987) (regional director of the Department of Social Services); Monge Vazquez v. Rohena Betancourt, 813 F.2d 22 (1st Cir. 1987) (regional director of the Department of Natural Resources); Collazo Rivera v. Torres Gaztambide, 812 F.2d 258 (1st Cir. 1987) (regional director of the Rural Housing Administration); Rodriguez v. Munoz, 808 F.2d 138 (1st Cir. 1986) (regional director of the Right to Employment Administration); Jimenez Fuentes v. Torres Gaztambide, 807 F.2d 236 (1st Cir. 1986) (regional directors of the Urban Renewal and Housing Corporation).

826 F.2d at 134.

See id. at 3, 8.  The plaintiff in Prisma Zona was slated to receive state funding "to take over the construction, ownership, and operation" of a children's museum in Puerto Rico.  Id. at 3. After a gubernatorial election, the new administration reneged on awarding the plaintiff the funding because of its ties to the outgoing governor and his political party.  See id. at 4.  This court held that the plaintiff "[did] not set forth a First Amendment violation even if the facts [were] as alleged" because consideration of the recipient's political affiliation was permissible.  Id. at 8.  Specifically, we reasoned:

> Even in core cases involving politically motivated hirings and firings, the Supreme Court has itself recognized that a wholly antiseptic application of the [policymaker] principle is unrealistic.  Instead, party affiliation is an appropriate consideration in hiring and firing decisions with respect to government positions that may be characterized as "policymaking" or "confidential."

> Here, Prisma [Zona] seeks to attack a set of decisions related to the possible privatization (whether to do so and through whom) of the operation of a children's museum and directing to it millions of dollars of public monies.  Where policy choices of this magnitude are presented, courts ought not be second-guessing how much party politics in the narrower sense may also have played a role. If political considerations are permissible in the hiring and firing of upper-level government employees, surely they are also appropriate in a case like this one. . . .

> Firing a street sweeper who voted for the loser is one thing; turning over a publicly

- 24 -

> funded $70 million museum to the opposition
> party is quite another.

Id. at 7-8 (citations omitted).

Prisma Zona makes clear that when private organizations take public funding to administer public entities without specific requirements, they become policymakers and may have that funding terminated for political reasons. See id. at 7. Because Eves's complaint describes nothing more than that very scenario, it cannot survive a motion to dismiss.

But even if we looked to the Maine statutory scheme, the result of the qualified immunity analysis would be the same. Just as the political affiliation of the recipient of government funding was relevant in Prisma Zona, so too a reasonable governor could have thought it relevant here. The President of GWH, like Prisma Zona, was in charge of administering a large sum of "public monies" to run a public entity. Id. at 7. In fact, GWH was charged by statute to "administer[]" the Center of Excellence for At-risk Students, which it has done by using the discretionary state funding to operate MeANS. See M.R.S.A. tit. 20-A, §§ 6951, 15689-A.20; 2009 Me. Legis. Serv. ch. 296, § 2. Although MeANS has its own principal and board of directors for day-to-day operations, GWH, as the administrator of the Center, is ultimately responsible for MeANS's compliance with its unique charter school obligations to the state. See id.

In evaluating whether a position qualifies under the policymaker exception, our precedent asks whether:

> (1) "the discharging agency's functions entail 'decisionmaking on issues where there is room for political disagreement on goals or their implementation,'" and (2) "'the particular responsibilities of the plaintiff's position resemble those of a policymaker, privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement for continued tenure.'"

Rosenberg v. City of Everett, 328 F.3d 12, 18 (1st Cir. 2003) (quoting Roldán-Plumey v. Cerezo-Suárez, 115 F.3d 58, 61-62 (1st Cir. 1997)).

A governor could have reasonably understood Eves's new position as President of GWH to entail "decisionmaking on issues where there is room for political disagreement." Id. In this case, there are multiple ways the President of GWH can achieve the organization's ultimate goal of promoting education for at-risk youth. Moreover, "an issue of special political significance" is at stake, Roman Melendez, 826 F.2d at 133: the success of GWH in implementing Governor LePage's education policies through the operation of MeANS.[11]

---

[11] LePage also argues that out-of-circuit precedent supports granting qualified immunity. The Fifth Circuit held in Kinsey v. Salado Independent School District, 950 F.2d 988 (5th Cir. 1992) (en banc), that the superintendent of a school district was a policymaking position, such that the superintendent's claim for political affiliation discrimination failed on the merits.

Against this legal backdrop, and faced with these facts particular to MeANS, GWH, and the state of Maine, a reasonable governor could have thought that Eves's political affiliation was relevant to his performance as President of GWH and that the policymaker exception applied to the position. At the time of these events, LePage could have concluded that no law clearly established that his communications with GWH rose to the level of unlawful First Amendment retaliation against Speaker Eves.

But even if Governor LePage were mistaken as a matter of law about whether Eves's position was encompassed by the policymaking exception, any such mistake was reasonable, and a reasonable mistake of law does not defeat qualified immunity. See al-Kidd, 563 U.S. at 743 ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions."); see also López-Quiñones, 526 F.3d at 27-28 ("[A]s the law stood when the decision was made a reasonable official could (albeit mistakenly) have deemed [plaintiff] outside Elrod/Branti's protection.").

---

Id. at 996. The majority reasoned that the superintendent was removable for political reasons because the occupant of the position possessed the power to "thwart" the School Board's goals. Id. Judge Higginbotham also stressed in his concurrence that nothing in the First Amendment obligated the Board to retain a Superintendent who did not share its policy views. See id. at 998 (Higginbotham, J., concurring). The federal district court for the Eastern District of Michigan held the same with respect to the president of a community college. See Heath v. Highland Park Sch. Dist., 800 F. Supp. 1470, 1477 (E.D. Mich. 1992).

Eves next turns to the Supreme Court cases Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr, 518 U.S. 668 (1996), and O'Hare Truck Service, Inc. v. City of Northlake, 518 U.S. 712 (1996), to argue that LePage violated Eves's political affiliation rights. But these cases do not clearly prohibit Governor LePage's actions "in light of the specific context of [this] case." Mullenix, 136 S. Ct. at 308 (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam)).

Umbehr and O'Hare do not help Eves because they did not involve the application of the policymaker exception, nor could they have, given their facts. They involved the termination of a binding commercial agreement with a contractor. In Umbehr, the defendant Board terminated an automatically renewing contract with the plaintiff's trash-hauling company in retaliation for the plaintiff's criticisms of a Board member. See 518 U.S. at 671. In O'Hare, the defendant mayor removed the plaintiff's company from a rotation of the city's tow truck services because the plaintiff refused to donate to the mayor's campaign and instead supported his opponent. See 518 U.S. at 715-16. It was never argued, unlike here, that the plaintiffs in these cases were policymakers whose exercise of First Amendment rights was relevant to their positions as independent contractors.[12]

_____

[12] In addition to this crucial difference, a reasonable governor still could have believed that his actions were

Eves also cites Agency for International Development v. Alliance for Open Society International, Inc., 570 U.S. 205 (2013) (AID).  But his en banc briefing only makes an unadorned reference to AID's applicability to his political affiliation claim.  Even if we were to consider Eves's argument, however, AID is far from being on all fours with this case and would not have provided LePage the requisite notice to defeat qualified immunity.  In AID, the Supreme Court held that Congress's policy requirement "mandat[ing] that recipients of [statutory] funds explicitly agree with the Government's policy to oppose prostitution and sex trafficking," by signing an agreement to that effect, violated the First Amendment because "freedom of speech prohibits the government from telling people what they must say."  Id. at 213 (quoting Rumsfeld v. Forum for Acad. & Inst. Rights, Inc., 547 U.S. 47, 61 (2006)).  But Eves is the plaintiff here, not GWH. And AID would not inform a governor in LePage's situation that this was not a policymaking position.

Finally, Eves contends that El Dia, Inc. v. Rossello, 165 F.3d 106, 108 (1st Cir. 1999), which held that it was

---

constitutional because unlike in Umbehr and O'Hare, the funds at issue here were left entirely to his discretion by statute.  That the legislature chose to condition GWH's funding upon GWH meeting its state-mandated objectives as to MeANS only reinforces the importance of GWH's public function and the reasonableness of Governor LePage's belief that the President of GWH was a policymaking position.  His en banc briefing explicitly raised this defense.

- 29 -

unconstitutional for a governor to leverage discretionary government advertising to a newspaper to express displeasure over the paper's critical coverage and to obtain favorable treatment, controls. But that case is "simply too factually distinct to speak clearly to the specific circumstances here." Mullenix, 136 S. Ct. at 312. El Dia simply did not implicate the policymaker exception. Accordingly, a reasonable governor in LePage's shoes would not have thought that El Dia governed his conduct in this matter.[13]

* * *

Governor LePage, for all of these reasons, was entitled to qualified immunity. Accordingly, we dismiss the damages claims against him.

**III.**

**We Hold that There Are No Remaining Equitable or State Law Claims**

We reinstate Parts III and IV of our prior panel opinion and hold again that Eves's claims for equitable relief and his state law claim must be dismissed. See SEC v. Tambone, 597 F.3d

---

[13] As to the out-of-circuit cases that Eves cites, they are factually distinguishable, and some were, in any event, published after LePage's conduct at issue, see Backpage.com, LLC v. Dart, 807 F.3d 229 (7th Cir. 2015). At the very least, the Supreme Court has underscored that "[w]hen the courts are divided . . . a reasonable official lacks the notice required before imposing liability." Ziglar, 137 S. Ct. at 1868.

436, 450 (1st Cir. 2010) (en banc) (reinstating portions of withdrawn panel opinion); United States v. Vega-Santiago, 519 F.3d 1, 6 (1st Cir. 2008) (en banc) (same).

Eves argues that we did not especially discuss his claim for declaratory relief in our prior opinion. We do so below and hold that the district court correctly dismissed his request for declaratory relief as moot.

"[T]o warrant the issuance of a declaratory judgment," Eves must demonstrate that there remains "a substantial controversy . . . of sufficient immediacy and reality." Unión de Empleados de Muelles de P.R., Inc. v. Int'l Longshoremen's Ass'n, 884 F.3d 48, 58 (1st Cir. 2018) (quoting Am. Civil Liberties Union of Mass. v. U.S. Conference of Catholic Bishops, 705 F.3d 44, 54 (1st Cir. 2013) (ACLUM)). He cannot do so. As such, "pronouncing" whether LePage's "past actions . . . were right or wrong," would be "merely advisory." ACLUM, 705 F.3d at 53 (quoting Spencer v. Kemna, 523 U.S. 1, 18 (1998)). Federal courts should not issue such advisory opinions. Id.

## IV.

## Conclusion

Our holding today is narrow and fact-bound: LePage is entitled to qualified immunity on Eves's political affiliation discrimination claim under the policymaker exception.

The district court's judgment is <u>affirmed</u> with respect to the dismissal of Eves's federal and state law claims.


— **Concurring Opinion Follows** —

**THOMPSON**, **Circuit Judge, with whom TORRUELLA and BARRON, Circuit Judges, join, concurring.**

According to Eves's complaint (whose well-pled allegations we must accept), Governor LePage pressured GWH into firing Eves by threatening to cut off GWH's state funding — pressure LePage applied principally because he views Eves as a political enemy.[14] To get anywhere, though, Eves must overcome the hurdle of qualified immunity. See District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018). Which means he must demonstrate that (1) LePage's conduct violated the First Amendment and that (2) clearly-established law showed as much. See id. If Eves stumbles at either step, his lawsuit is over. See Pearson v. Callahan, 555 U.S. 223, 236 (2009).

The en banc opinion starts and stops at step (2) — *i.e.*, the decision assumes that even if Governor LePage got Eves fired because of Eves's political leanings, no clearly-established law prevented LePage from thinking Eves held the kind of policymaking job at GWH for which political affiliation was a legitimate credential. And given the unique relationship that existed between GWH, the Center, and MeANS, I'm fully on board with the opinion's policymaker-driven conclusion.

---

[14] Following the en banc opinion's lead, I sometimes refer to LePage and Eves as Governor LePage and Speaker Eves — even though LePage left office in January 2019 and Eves left office in December 2016.

Take note, however:  if the policymaker exception hadn't been in play, I'd have no trouble concluding that in the circumstances of this case, Eves sufficiently pled a violation of his constitutional right.  Allow me to explain.

**I**

In qualified-immunity cases, courts can (as intimated above) jettison a constitutional claim for either of two reasons — because the claimed constitutional right doesn't exist, step (1); or because the constitutional right wasn't clearly established when the alleged misconduct occurred, step (2).  Id. Admittedly, courts may address the two steps of the qualified-immunity inquiry in any order.  Id.  But reflexively granting qualified immunity without first deciding whether the complained-of conduct offends the Constitution (*i.e.*, resolving cases solely at step (2)) results in fewer and fewer courts establishing "constitutional precedent," let alone the kind of clearly-established precedent needed to overcome a qualified-immunity claim — a phenomenon known as "constitutional stagnation."  See id. at 232.  And this phenomenon can put plaintiffs like Eves in a vicious cycle:  they "must produce precedent even as fewer courts are producing precedent"; "[i]mportant constitutional questions go unanswered precisely because those questions are yet unanswered"; and "[c]ourts then rely on that judicial silence to conclude there's no equivalent case on the books" and thus no violation of

- 34 -

clearly-established law.  See Zadeh v. Robinson, 902 F.3d 483, 499 (5th Cir. 2018) (Willett, J., concurring dubitante).

What can break the cycle, however, is starting with step (1) — the constitutional-violation step, an approach courts should take in cases involving a recurring fact pattern where (a) help on the constitutionality of the contested practice is needed and (b) the practice is likely to be contested only in the qualified-immunity context.  See Camreta v. Greene, 563 U.S. 692, 705-06, 706 n.5 (2011).[15]  And having thought about this case a lot, I believe deciding whether LePage infracted the Constitution would advance the law's development:  if not resolved, the First Amendment issues pressed here could arise again and again — indeed, it's clear LePage's briefs suggest public officials think they are freer to keep funds from private entities than the First Amendment actually allows.  See Pearson, 555 U.S. at 237 (noting that

---

[15] Conversely, judges should resolve a case exclusively at step (2) — the clearly-established-law step — where, for example, the step (1) issue "is so factbound that the decision" on the constitutional-violation question "provides little guidance for future cases," Pearson, 555 U.S. at 237; "a higher court" may "soon . . . decide[]" the issue, id. at 238; "qualified immunity is asserted at the pleading stage" and "the precise factual basis for the . . . claim . . . may be hard to identify," id. at 238-39; dealing with step (1) creates "a risk of bad decisionmaking" because the briefing is poor, id. at 239; discussing both steps risks "bad decisionmaking" because the court may believe the law isn't clearly established and so give scant thought to whether the constitutional right exists, id.; and "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," id. at 237.

qualified immunity's step (1) "is intended to further the development of constitutional precedent").

So on to step (1).

**II**

**A**

Eves basically claims Governor LePage promised to put GWH out of business unless it dumped him as president, all because LePage didn't like his politics. The en banc opinion mentions some of the operative complaint's allegations of political vendetta-ism. Other allegations noted in the complaint but not the en banc decision include:

- "Governor LePage knew that the unexpected loss of the $1,060,000 in discretionary state funding for [GWH] would also jeopardize another $2,750,000 in private funding for [GWH] from the Harold Alfond Foundation," and he "knew" too "that the combined loss of the $1,060,000 in state funding and $2,750,000 in funding from [the] Harold Alfond Foundation would likely force [GWH] out of existence."

- "Because of LePage's blackmail, [GWH] was forced to fire [Eves] without cause . . . ."

- "After [GWH] fired Eves, LePage released on schedule all of the quarterly installments for the $1,060,000 in discretionary state funds for [GWH] included in the [relevant] budget."

- "The [GWH] Board Chair testified" before a legislative oversight committee that "Speaker Eves would be its President today except for Governor LePage's threats to withhold $1,060,000 in budgeted state funding unless Speaker Eves was fired."[16]

## B

Moving from the facts to the law, we've known since the 1970s that the First Amendment protects "nonpolicymaking, nonconfidential" public employees from suffering adverse employment consequences because of their "political beliefs." See Elrod v. Burns, 427 U.S. 347, 375 (1976) (Stewart, J., concurring in the judgment); see also Branti v. Finkel, 445 U.S. 507, 518 (1980). "Non" is a key qualifier, because (as relevant here) if the effective performance of a public employee's job requires "political loyalty" — "either because the job involves the making of policy and thus the exercise of political judgment . . ., or because it . . . gives the [job] holder access to . . .

---

[16] In outlining the complaint's allegations, the en banc opinion repeatedly says that Eves failed to attach certain letters to his pleading — for instance, the decision notes that LePage "sent a handwritten note to GWH's Board Chair, which as characterized in the complaint, 'referred very negatively to Speaker Eves' and called him a 'hack,'" but adds that Eves did not "append[]" the note to the complaint. True enough, but irrelevant. As I understand it, Eves's not attaching these missives plays no part in the en banc opinion's decisional calculus. Which makes sense, because the opinion doesn't cite (and I've not found) any case suggesting (never mind holding) that he had to include these letters with his pleading.

confidential, politically sensitive thoughts" — then and only then will the First Amendment permit a political firing. See Riley v. Blagojevich, 425 F.3d 357, 359 (7th Cir. 2005) (Posner, J.) (citing Elrod and Branti). This is called the "policymaker" exception to the rule against political discrimination. See, e.g., Wilbur v. Mahan, 3 F.3d 214, 217 (7th Cir. 1993) (Posner, J.) (discussing Elrod and Branti, among other decisions, and noting that the policymaker exception "reflect[s] a recognition that some patronage hiring may be essential to democratic government," for "elected officials cannot implement the policies that they were elected to carry out, and hence the will of the electorate cannot be effectuated, unless the officials can [have] their political allies in the most sensitive jobs").[17]

Also critically, we've known since the 1990s — thanks to a pair of contractor-speech cases, O'Hare Truck Service, Inc. v. City of Northlake, 518 U.S. 712 (1996), and Board of County Commissioners v. Umbehr, 518 U.S. 668 (1996) — that courts occasionally treat nonpublic employees like public employees in applying the rule against political discrimination. See generally

---

[17] Don't be fooled by the "policymaker" moniker. Anyone who leads an organization (be it public or private) is a policymaker in one sense, since she (supposedly) sets policy for the organization. But that alone doesn't make her a policymaker for First Amendment purposes — what counts is whether her duties make political loyalty a suitable "requirement for the effective performance" of the job, like they do for a close advisor to a government official. See Branti, 445 U.S. at 518.

*Umbehr*, 518 U.S. at 677 (employing the Court's "existing framework for government employee cases to independent contractors"). Which means courts occasionally treat certain nonpublic employees like policymakers too. See *Ramírez* v. *Arlequín*, 447 F.3d 19, 23 (1st Cir. 2006) (citing *Prisma Zona Exploratoria de Puerto Rico, Inc. v. Calderón*, 310 F.3d 1 (1st Cir. 2002)).

## C

Leaving aside for a moment the relevance of the policymaker exception, I think Eves's complaint — alleging that Governor LePage bullied GWH into canning Eves because of Eves's political affiliation — adequately pleads a constitutional violation, when viewed through the correct legal lens. And none of LePage's arguments to the contrary hits home.

## 1

Yes, the at-issue funds were to go to a private entity as an exercise of Governor LePage's discretionary grant-making power — a fact LePage harps on. But that hardly means the First Amendment places no limits on the exercise of that discretion. Just consider the contract cases. Neither involved the actual breach of an existing contract. One involved the government's discretionary decision not to renew a contract. See *Umbehr*, 518 U.S. at 671. The other involved the government's discretionary decision to remove a company from an approved list of contractors. See *O'Hare Truck Serv.*, 518 U.S. at 714-15. So — and not to put

too fine a point on it — the cases themselves involved discretionary decisions not to spend government money on certain vendors.  Yet the Supreme Court still thought these discretionary calls could be sufficiently coercive to ground a political-discrimination claim.  And the Court has never held that government-imposed conditions on discretionary grant funding — which is exactly what we have here — are categorically immune from First Amendment challenges.  See generally Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc., 570 U.S. 205, 214 (2013) (stating that "[i]n some cases, a funding condition can result in an unconstitutional burden on First Amendment rights").[18]

**2**

Governor LePage plays up the fact that the funds he would've impounded hadn't yet been appropriated — what we have, he emphasizes, is a *threatened* funding cut-off, rather than an *actual* one.  But this fact alone doesn't give him carte blanche to base his funding decisions on the partisan affiliation of the entity's chosen leader.  Take, for example, a case from a sibling circuit where the governor publicly "threaten[ed] a political rival and prominent businessman" with greater regulatory scrutiny simply

---

[18] The situation of course might be different in a case where, unlike here, the government chooses not to grant funds to an entity that hasn't previously received and relied on a particular funding source.  See Prisma Zona Exploratoria de Puerto Rico, Inc., 310 F.3d at 7 & n.3 (noting that the Supreme Court hasn't spoken definitively on that issue, and collecting circuit cases).

- 40 -

because the businessman publicly opposed one of his proposals. See Blankenship v. Manchin, 471 F.3d 523, 525-27 (4th Cir. 2006). As the circuit court persuasively explained, an official's threatened use of governmental power may be coercive enough to support a First Amendment retaliation claim if the threatened action is sufficiently "imminent." See id. at 533.

And I know no reason why a threat to impound funds must be deemed inherently noncoercive and thus completely immune from First Amendment scrutiny just because the threat hasn't been actualized. A threat to regulate, after all, is accomplished merely through words. And even if it never takes actual effect, it can be a powerful means of exercising coercive governmental power, because of the harm that'll necessarily follow if the threat's recipient doesn't take it seriously — ultimately it's coercion that matters for First Amendment purposes, not the particular means by which coercion is exercised. See Ramírez, 447 F.3d at 22 (holding that a government generally "may not coerce persons into supporting a political party or punish them for exercising their right of association").

So if the threatened funding cut-off is similarly likely to exert undue influence on the funding recipient, then I can't see why the First Amendment wouldn't limit the grounds on which the government could base the cut-off. And Eves has alleged that the threatened cut-off was coercive in just that way, given GWH's

- 41 -

past reliance on the at-issue funds and its dependence on those funds for its future operations. It's thus reasonable to conclude — at least under the facts alleged — that LePage made the threat precisely because of the influence that he thought the threat would have on GWH.

**3**

Governor LePage notes how the target of his threats wasn't the person the funding recipient (GWH) selected as its president (Eves) but rather the funding recipient itself. That LePage conditioned his threat on GWH's dumping Eves because of Eves's party affiliation confirms he based his threat on Eves's party affiliation — so this fact doesn't show the absence of a First Amendment violation, despite what LePage thinks. Anyway, to hold otherwise would simply encourage executives to maneuver around the constitutional limits the Supreme Court cases establish — as would our silence on whether such a funding condition is permissible.[19]

On to step (2) then, the clearly-established-law step.

---

[19] LePage also says that regardless of the First Amendment's protections, he's safeguarded from suit under the doctrine of "absolute legislative immunity," see Bogan v. Scott-Harris, 523 U.S. 44, 54 (1998) — an argument not addressed in the en banc opinion. Sure, LePage made his threats during the new budget's passage. But his threats concerned the *executive* action he'd take after the budget's enactment — *i.e.*, using his disbursement discretion to not fund GWH. Which is why I agree with the district court that absolute legislative immunity doesn't apply here.

## III

### A

A right is "clearly established" if it's "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (citation and internal quotation marks omitted). This is a fair-warning standard — officials are liable "for violating bright lines, not . . . for making bad guesses in gray areas." Belsito Commc'ns, Inc. v. Decker, 845 F.3d 13, 23 (1st Cir. 2016) (quoting Rivera-Corraliza v. Morales, 794 F.3d 208, 215 (1st Cir. 2015)); see also al-Kidd, 563 U.S. at 746 (Kennedy, J., concurring) (emphasizing that qualified immunity applies if defendants have no "'fair and clear warning' of what the Constitution requires" (quoting United States v. Lanier, 520 U.S. 259, 271 (1997))).

A factually on-point precedent certainly helps in deciding what reasonable officials would know. But it's "not necessary . . . that the very action in question has previously been held unlawful." Ziglar v. Abbasi, 137 S. Ct. 1843, 1866 (2017) (citation and internal quotation marks omitted). Rather, officials lose their qualified immunity, "even in novel factual circumstances," if they committed a "clear" constitutional violation, see Hope v. Pelzer, 536 U.S. 730, 738-39, 741 (2002) — as a case of ours pithily put it, when the "coerciveness" of the

officials' actions is "patently" obvious, "no particular case" (let alone a completely-on-point one) must've "existed to put" reasonable officials "on notice" of the actions' "unconstitutionality." See Marrero-Méndez v. Calixto-Rodríguez, 830 F.3d 38, 47 (1st Cir. 2016) (citation and internal quotations marks omitted).

And that's as it should be. "[T]he easiest cases," common sense tells us, "don't even arise." See K.H. ex rel. Murphy v. Morgan, 914 F.2d 846, 851 (7th Cir. 1990) (Posner, J.). For example, there's "never been a section 1983 case accusing welfare officials of selling foster children into slavery." Id. Yet it doesn't "follow that if such a case arose, the officials would be immune from damages liability because no previous case had found liability in those circumstances." Id.

What matters ultimately is whether "the relevant legal rights and obligations [were] particularized enough that a reasonable official" could "extrapolate from them and conclude that a certain course of conduct will violate the law." See Savard v. Rhode Island, 338 F.3d 23, 28 (1st Cir. 2003) (en banc) (opinion of Selya, J., joined by Boudin, C.J., and Lynch and Howard, JJ.). And to that subject I now turn.

**B**

From the First Amendment decisions arrayed above (*long on the books* when LePage acted) a sensible governor could

extrapolate that he couldn't use his discretionary-spending power to intimidate a private entity into firing his political adversary, just to stick it to his adversary — unless (and to repeat) the adversary's job was a policymaking position. And a sensible governor could also surmise as much from a First Circuit opinion (issued *well before* the events in question), El Día, Inc. v. Rosselló, 165 F.3d 106 (1st Cir. 1999).

El Día, Inc. owns and publishes a Spanish-language daily newspaper called *El Nueva Día*. Id. at 108. In 1997, *El Nueva Día* ran some articles criticizing Puerto Rico's then-governor and his administration. Id. Not willing to take this lying down, the governor and other officials ordered nearly two-dozen commonwealth agencies to stop advertising in *El Nueva Día*. Id. El Día, Inc. then sued the responsible officials in federal court, alleging restriction of its First Amendment rights. Id. Convinced the defendants' actions, if proven, would violate clearly-established law, the district judge denied them qualified immunity at the motion-to-dismiss stage. Id.

Asking for a reversal, the defendants insisted that no "'clearly established' First Amendment law" barred them from pulling discretionary "government advertising" from the paper as punishment for its less-than-flattering write-ups. See id. Not so, we said in 1999 (*years before* the happenings in Eves's case), in words that resonate here: "[i]t would seem obvious that using

- 45 -

government funds" as a stick to punish First Amendment activity offends the Constitution because "[c]learly established law prohibits the government from conditioning the revocation of benefits on a basis that infringes constitutionally protected interests."  Id. at 109-10.  And for support we cited several Supreme Court opinions, including Umbehr.  Id. at 110.

Again putting aside the policymaker exception, I can't see how the Governor of Puerto Rico (among other officials) — who did basically the same thing alleged here (political retaliation through the withholding of discretionary funds) — could've known from the caselaw that his conduct crossed a constitutional line but Governor LePage couldn't have.

**IV**

The only question left then is whether Eves held a policymaking job with GWH, thus making his party affiliation something LePage could rely on in threatening to defund GWH.  And on that highly fact-dependent question, I agree with the en banc decision on these points (*fyi*, I've lifted the following quotes from the en banc decision, though the emphasis is mine):

- Maine's legislature "designated" GWH "the nonprofit charitable corporation with a *public* purpose to implement the Center," "designat[ed]" the Center "a *public* entity," and left the governor with "discretion to fund the Center."

- 46 -

- Also, and of great importance to me, "GWH fulfills its *public* function of implementing the Center *only* by administering MeANS" — indeed, Eves's counsel candidly (and commendably) "conceded" at en banc "oral argument that the operation of MeANS is the *only* way in which the Center has been implemented."

- Plus, Eves identifies no clearly-established law that would deter a reasonable governor from believing the job of GWH president resembled that of "a policymaker given GWH's statutory mandate to administer a *public* entity, the Center . . ., and its choice to do so solely through MeANS."[20]

And after much reflection, I agree with the en banc opinion that in the "unique" circumstances of this case, a levelheaded governor could've believed, even if wrongly, that the job of GWH president — the very "highest" post at GWH — resembled that of a policymaker. Which suffices to secure qualified immunity for LePage.

---

[20] Given how fact-dependent the policymaker analysis here is, I agree with the en banc opinion that we — in exercising our sound discretion — can decide the issue at step (2) of the qualified-immunity test. See Pearson, 555 U.S. at 236-37.

- 47 -

**V**

Circling back to first principles, I close with a cautionary note — one worth making given all the state-funds-receiving entities out there.[21]

The First Amendment typically bars public officials from threatening to cut off funds to a previously-funded entity unless the entity picks a leader to their liking — I say "typically," because of the policymaker exception to the ban on politically-based personnel decisions.  See, e.g., Elrod, 427 U.S. at 355, 367 (stressing that an official's conditioning employment on political loyalty is tantamount to a system of "coerced belief," and concluding that "patronage dismissals" are limited under the First Amendment to "policymaking positions").  And against the legal backdrop discussed above, Eves's allegations (that Governor LePage coercively engineered his firing from GWH as political payback) state a sufficient First Amendment claim — but for the policymaker exception, which the en banc opinion correctly applies in declaring LePage qualifiedly immune.

---

[21] As examples, Eves's complaint mentions "the Maine Association of Substance Abuse Programs, Inc.; the Family Violence Assistance Project; Bowdoin College; the Lobster Conservancy; the Maine Island Trail Association; Next Step for Victims of Domestic Violence[;] and Trout Unlimited"; "Maine Public Radio[;] all of Maine's hospitals and nursing homes[;] and many of its homeless shelters, social service providers, and private high schools."

Let's never forget, though, that the policymaker exception is exactly what its name implies:  an *exception* — and a "narrow" one at that — to the clearly-established rule against politically-motivated firings.  See <u>Borzilleri</u> v. <u>Mosby</u>, 874 F.3d 187, 191 (4th Cir. 2017).  And in dealing with the First Amendment — which protects some of our most cherished rights, <u>see</u> <u>Williams</u> v. <u>Rhodes</u>, 393 U.S. 23, 30-31 (1968) — courts must be ever-vigilant in ensuring that this limited exception doesn't swallow the rule. Anything less would deal a serious blow to the fundamental principles of our democracy.