# United States Court of Appeals
## For the First Circuit

No. 19-1677

CHRISTOPHER CASTAGNA; GAVIN CASTAGNA,

Plaintiffs, Appellees,

v.

HARRY JEAN; KEITH KAPLAN; DARAN EDWARDS,

Defendants, Appellants.

JEAN MOISE ACLOQUE; GARY BARKER; MICHAEL BIZZOZERO; TERRY
COTTON; RICHARD DEVOE; JON-MICHAEL HARBER; CLIFTON HAYNES; GAVIN
MCHALE; KAMAU PRITCHARD; WILLIAM SAMARAS; STEPHEN SMIGLIANI;
ANTHONY TROY; JAY TULLY; BRENDAN WALSH; DONALD WIGHTMAN; JAMES
DOE, Individually; JOHN DOE 1; JOHN DOE 2; JOHN DOE 3; JOHN
DOE 4; JOHN DOE 5; JOHN DOE 6; JOHN DOE 7; JOHN DOE 8; JOHN
DOE 9; JOHN DOE 10; JOHN DOE 11; JOHN DOE 12,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

Before

Lynch, Stahl, and Kayatta,
Circuit Judges.

Nicole M. O'Connor, Senior Assistant Corporation Counsel,
City of Boston Law Department, with whom Eugene L. O'Flaherty,
Corporation Counsel, City of Boston Law Department, and Matthew M.
McGarry, Assistant Corporation Counsel, City of Boston Law
Department, were on brief, for appellants.

Paul J. Klehm, with whom Benjamin L. Falkner and Krasnoo, Klehm & Falkner LLP were on brief, for appellees.

———————————————

April 10, 2020

———————————————

**LYNCH**, **Circuit Judge**.  This appeal raises the issue of whether the three defendant Boston police officers were entitled to qualified immunity for entering through the open door of a house under the community caretaking exception to the Fourth Amendment's warrant requirement.  We hold that the officers are entitled to qualified immunity under these circumstances.  We reverse the judgment for the plaintiffs and remand for the district court to enter judgment for the defendants.

## I.

Qualified immunity is "an immunity from suit rather than a mere defense to liability."  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis omitted).  As such, a typical § 1983 defendant raises the qualified immunity defense in a motion to dismiss or motion for summary judgment.  Wilson v. City of Boston, 421 F.3d 45, 52 (1st Cir. 2005).  The officers in this case did not raise their specific qualified immunity defense until they filed a motion for judgment as a matter of law at the end of the jury trial, to which the jury ruled for the officers.  But this case's "unusual posture does not affect the viability of the qualified immunity defense."  Id. at 53.

"[W]hen a qualified immunity defense is pressed after a jury verdict, the evidence must be construed in the light most hospitable to the party that prevailed at trial."  Id. (quoting Iacobucci v. Boulter, 193 F.3d 14, 23 (1st Cir. 1999)).  We first

recite the facts in the light most favorable to appellants Daran Edwards, Harry Jean, and Keith Kaplan. Then we discuss this lawsuit's procedural history.

A.  Facts

On March 17, 2013, the appellees, brothers Christopher and Gavin Castagna, hosted a St. Patrick's Day party for their friends at Christopher's apartment, located on the first floor of a three-story building at the intersection of East 6th Street and O Street in South Boston. The party was large enough that Christopher and Gavin moved furniture in advance of the party's start to accommodate the number of guests and purchased a keg of beer. One of the police officers later estimated that when he arrived at the scene there were as many as thirty guests there. As one guest testified, St. Patrick's Day in Boston is basically "a big party throughout the entire city."

By early evening, many of the guests at the Castagnas' party were intoxicated. Different guests estimated that they drank "between [twelve] and [fifteen] beers," eleven to thirteen beers, "ten beers," and "seven or eight beers" that day, respectively.

At 5:54 p.m., someone called 911 to report a loud party at the intersection of East 6th Street and O Street, the intersection where Christopher's apartment was located. At 7:29 p.m., police dispatch directed a group of officers to respond to the call. The officers sent were part of a unit composed of seven

- 4 -

officers, including Edwards, Jean, and Kaplan. Although the unit normally worked in another neighborhood in the city, the officers had been reassigned to South Boston for the St. Patrick's Day holiday to supervise the parade in the morning and control "loud crowds, partying, [and] fighting" in the afternoon and evening. Many of the officers had done similar work on St. Patrick's Day in prior years.

The seven officers arrived at the scene at approximately 7:38 p.m. At that point in the evening, Christopher's apartment was the only one near the intersection with any observable signs of a party.

When Kaplan arrived on the scene, he heard screaming, music, and talking coming from Christopher's apartment. As he approached the apartment, Kaplan saw two or three guests leave the party. He thought one may have turned around and gone back inside, possibly to warn the others. In Kaplan's opinion, "[t]hey looked like they were underage." When he got close to the apartment, Kaplan could see into it because the "door was wide open." He also could see through the top of the window that there were people drinking inside. He testified that his first objective after arriving at the apartment was "to make contact with the owners."

Edwards gave a similar account. When he arrived, he also heard loud music and, through an open window, saw people drinking, some of whom he believed to be underage.

Jean arrived slightly after his fellow officers. He also heard music, saw that the front door was open, and noticed through the window that the people inside were drinking. He, too, believed that some of the guests were underage.[1] As he approached the apartment, Jean "saw a young male come stumbling outside" onto the public sidewalk. Jean testified that the young man "walked around like -- you know, like a circle or half-circle, and then he hurled over, vomiting, and he did that twice. And then he stumbled back into the address that we were looking at."

Kaplan reached the apartment door and yelled "hello" several times and then "Boston Police." No one answered. According to Kaplan, "[w]hen no one answered, we kind of walked in."

At that point, none of the officers were intending to arrest anyone at the party, for underage drinking or any other crime. Kaplan explained that this response was in line with the police department's normal practice for responding to noise complaints: "Typically, we would just knock on the door, try to see who the owners are and tenants and have them turn the music down, shut the doors, keep the windows up and keep everything

---

[1] Christopher, the host, admitted that he did not know the age of every guest at his party and did not ask to see anyone's identification. In addition, many of the guests who were of legal drinking age were only a few years older than twenty-one. One guest admitted at trial that at the time of the party she could have looked underage.

inside." Indeed, several of the officers did not have their handcuffs on them, which would have been necessary to make an arrest, explaining that they left them behind to lighten their load during a long day walking the parade route.

The officers explained at trial that there were two reasons for entering the home that evening: (1) to respond to the noise complaint by finding the homeowners and having them lower the volume of their music and (2) to make sure that any underage drinkers were safe, including the young-looking man who had vomited outside the home and returned inside.

Kaplan explained that "[o]f course, there's safety involved when there's underage drinkers." His goal was "to make sure everyone was safe, community caretaker, . . . trying to make sure that there weren't any other underage drinkers in there or that nobody was sick and nobody was throwing up." Jean testified that his intention when entering the home "was strictly just . . . the well-being check, . . . doing community caretaker work, and to speak to the owner, . . . to locate him, speak to him what's going on . . . because it was spilling onto the sidewalk."

The guests were in the middle of a dance competition when the police entered through the open door, and they did not immediately respond. Eventually, when they noticed the officers,

the guests turned off the music.[2]  Kaplan explained that there had been a complaint of underage drinking and asked for the homeowners.

There was a lull in which no one answered.  Eventually some of the guests told the police that the owner's name was "Chris," but he was not in the room and was "in the back or the bathroom or something to that effect."  Jean and another officer went to look for Christopher while the others stayed in the kitchen with most of the guests.

The officers explained at trial why it was important to talk to the owner of the property even though there was no longer any disruptive, loud music.  Jean testified:  "[H]e's the person in control of the apartment . . . . He's the one who would probably authorize all these people to be here. . . . I don't know if it's an abandoned apartment and they're just throwing a party in it."  Edwards agreed that it was important to talk to the homeowner "[b]ecause the homeowner is the person who's in charge of the apartment."

As Jean and the other officer made their way down the back hall, one of the guests heard them remark that they smelled

---

[2]     One party guest testified that that she thought the music had been turned off.  The police officers testified that their general practice was to have the music turned down when responding to noise complaints.  The police officers were not asked at trial if the music was turned off or merely down when they initially entered the apartment.  We assume arguendo the music was turned off.

drugs. The two officers knocked on the door of what they thought was the bathroom but was in fact Christopher's bedroom. According to Jean, the officers thought, "[w]e're going to let this guy use the bathroom, and then we'll talk to him, you know. We were patient. We had no problem." Jean eventually realized that the room they were waiting outside of was probably not a bathroom when he heard multiple voices coming from inside it, so he knocked on the door again. That was when Christopher and Gavin, who were inside with two other guests, heard the knocking at the door. Christopher opened the door for the officers. Christopher testified that this was the first time he realized police were in the apartment.

After Christopher opened the door for Jean, Jean announced himself as "Boston Police." Jean observed that Christopher appeared to have been drinking and noticed that there was marijuana in the bedroom. Christopher saw Jean looking at the marijuana, and in response he pushed Jean, slammed the door on Jean's foot, and held the door there.[3] Jean pushed the door back open, freeing his foot, and walked into the room.

---

[3] Under state law in 2013, possession of less than one ounce of marijuana was a civil offense, subjecting the offender to a fine and forfeiture of the marijuana. Mass. Gen. Laws ch. 94C, § 32L (repealed 2017). The marijuana found in Christopher's room was seized and he was cited for it.

Edwards and Kaplan, who noticed that Jean and the other officer were missing, went to the back rooms to look for them. At that point Edwards and Kaplan were still trying to figure out who the homeowners were so that the officers could respond to the loud party complaint.

In the bedroom, Christopher shoved Jean a second time and the conflict between the officers and the party guests escalated. Other officers were called as back-up. Eventually, several of the guests and both brothers were arrested on various charges. The rest of the details about what happened in the bedroom and after the other responding officers arrived are not relevant to this appeal.[4]

B.   Procedural History

Christopher and Gavin sued the twenty Boston Police Officers who were involved in breaking up the party and arresting them, including Edwards, Jean, and Kaplan. The Castagnas brought civil rights claims under 42 U.S.C. § 1983 and Mass. Gen. Laws ch. 12, §§ 11H and 11I, as well as state tort claims for false imprisonment, assault and battery, false arrest, and malicious prosecution. By the start of the trial, the district court had

---

[4]   The sole claim on appeal is the unlawful entry claim, which was brought against only Edwards, Jean, and Kaplan and relates just to the conduct described above.

dismissed several claims and removed from the lawsuit thirteen of the twenty defendants.

The trial was held over eight days between June 11 and 21, 2018. The Castagnas each advanced seven claims, brought variously against the seven remaining police officer defendants: unlawful entry under § 1983, unlawful seizure under § 1983, excessive force under § 1983, violation of the First Amendment under § 1983, assault and battery, false arrest, and malicious prosecution. The unlawful entry claim was brought against officers Edwards, Jean, and Kaplan only.

As to the unlawful entry claim, the district court declined to instruct the jury on the community caretaking exception to the warrant requirement over the defense's objections, explaining that it was not adequately defined in the law. Instead the jury was instructed on the exigent circumstances exception only, and the court stated that it would consider arguments about community caretaking in the context of qualified immunity after the jury returned its verdict.[5]

---

[5] The jury instructions for the unlawful entry claim were as follows:

> Under the Fourth Amendment, no person shall be subjected to a warrantless search of his or her home except under exigent circumstances, that is, circumstances requiring immediate action and with probable cause.
> Probable cause exists if the facts and circumstances known to the Defendant are sufficient to warrant a reasonable police

- 11 -

Before the jury returned with its verdict, Edwards, Jean, and Kaplan filed a motion for judgment as a matter of law, in which they argued that their entry into both the apartment and the bedroom was justified by the community caretaking exception to the warrant requirement. Further, they argued that were entitled to qualified immunity on the same grounds and because the law on community caretaking in 2013 did not clearly establish that their entry violated either brother's constitutional rights.

The jury reached a unanimous verdict in favor of all of the defendants on all counts. As to the unlawful entry claim under § 1983, the jury was asked on the verdict form if Christopher or Gavin had proven by a preponderance of the evidence that Edwards, Kaplan, or Jean had violated their constitutional rights by entering either Christopher's apartment or specifically his bedroom on March 17, 2013. The jury responded "no" to each question for each of the three officers. The district court denied as moot Edwards, Jean, and Kaplan's motion for judgment as a matter

---

officer in believing that the plaintiff has committed or is committing a crime.
Circumstances requiring immediate action are limited to the following:
1. hot pursuit of a fleeing felon;
2. threatened destruction of evidence;
3. risk of escape; and
4. threat to the lives and safety of the public, the police, or the plaintiff.

of law on the unlawful entry claim in light of the jury verdict in their favor.

On July 20, 2018, the Castagnas moved for a new trial, arguing that "the jury's finding that Defendants Kaplan, Edwards and Jean are not liable to Plaintiffs under 42 U.S.C. § 1983 for the unlawful entry into Christopher Castagna's home, or, at the very least, into Christopher Castagna's bedroom," is "against the law, the weight of credible evidence and constitutes a miscarriage of justice."[6]

On January 17, 2019, the district court granted the Castagnas' motion for a new trial, finding "that the verdict is against the law as to the warrantless entry into the home and that the warrantless entry on the facts at trial is not protected by qualified immunity." The court said the entry into the bedroom claim was merely a subset of the entry into the home claim, thereby saying it was not an independent claim.

Because the only issues still to be resolved at that point in the proceedings were legal issues, instead of holding a

---

[6] The Castagnas also argued that a new trial was warranted because "the Court improperly instructed the jury regarding disorderly conduct or disturbing the peace" and "in her closing, Defendants' counsel made improper references to Plaintiff Christopher Castagna being a racist, even though there was no evidence at trial that demonstrated that he was a racist, and the Court's curative instruction to the jury failed to cure the error." The district court rejected these arguments, and the plaintiffs have not appealed these denials.

new trial, the court instructed the Castagnas to move orally under Fed. R. Civ. P. 52 for the court to amend the judgment so that Edwards, Jean, and Kaplan would be liable for the unlawful entry claim. Without conceding their liability, the three officers moved for a ruling that the Castagnas had not proven a right to any damages beyond nominal damages.

On June 28, 2019, the district court amended its judgment under Fed. R. Civ. P. 52 so that it reflected a judgment in favor of Christopher and Gavin and against Edwards, Jean, and Kaplan as to the § 1983 unlawful entry claim. The court awarded the two brothers one dollar in nominal damages from each of the three officers. The court did not disturb any of the other jury verdicts.

This timely appeal followed.[7]

---

[7] Edwards, Jean, and Kaplan make two arguments on appeal that we do not reach because we hold that they were entitled to qualified immunity.

First, they argue that the Castagnas "made a strategic choice" not to bring a motion for judgment as a matter of law, and in fact, were the parties to initially suggest a jury instruction on exigent circumstances. When the district court gave the instruction, they did not object. Having made these strategic choices, the officers argue, it was an abuse of discretion for the district court to then grant the Castagnas a new trial to save them from the consequences of those choices. Specifically, the officers argue that the district court misapplied the legal standards for granting a new trial by conducting a purely legal analysis, rather than one "keyed to the trial's fairness." In their view, the fact that the district court declined to actually hold a new trial and instead heard oral cross-motions pursuant to Fed. R. Civ. P. 52 only highlighted why the trial was fundamentally

- 14 -

Edwards, Jean, and Kaplan were entitled to qualified immunity for the unlawful entry claim under a community caretaking theory.[8]  As we explain below, neither part of the test for defeating qualified immunity has been met:  the officers' entry into the home was in fact constitutional under the community caretaking exception and it was not clearly established at the time of their entry that the community caretaking exception would not give them an immunity defense.[9]

---

fair and the new trial motion never should have been granted in the first place.

Second, the officers argue that, even assuming the district court's premise that it could grant a new trial motion in these circumstances, the court was wrong to find that the jury's verdict was against the law or weight of credible evidence.  There was sufficient evidence for the jury to have considered and applied the emergency aid part of the exigent circumstances exception to the warrant requirement.  Any finding to the contrary must have been based on the court's own assessment of witness credibility, which would be error.  And even though the jury was never instructed on the community caretaking exception to the warrant requirement, "there was sufficient evidence for the jury to consider and decide the applicability of the community caretaking exception, [so] the jury's decision in [the officers'] favor was not unfair and did not affect [the Castagnas'] substantial rights."

Again, we do not reach these arguments.

[8]     On appeal, the officers also argue that they are entitled to qualified immunity because their entry fell within the emergency aid exception to the warrant requirement.  We need not reach this argument.

[9]     As to qualified immunity for community caretaking, the officers argue,

> [q]ualified immunity impacts the instant case
> in two ways.  First, as a general matter, the
> doctrine is "an immunity from suit" and so if

As to the claim made at trial that the entry into the bedroom constituted a separate offense, it is waived. It is waived because the district court did not grant a new trial on that ground and plaintiffs have not cross-appealed. It is also waived because it has not been briefed as required on appeal. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

A.   Qualified Immunity Framework

When sued in their individual capacities, government officials like police officers Edwards, Jean, and Kaplan are immune from damages claims unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" Eves v. LePage, 927 F.3d 575, 582-83 (1st Cir. 2019) (en banc) (quoting District of Columbia

_____

it applied here, the District Court should not have permitted Plaintiffs to proceed further against Defendants. White v. Pauly, 137 S. Ct. 548, 551 (2017). Second, qualified immunity is intertwined with the standard for a new trial; specifically, Federal Rule of Civil Procedure 61 provides that no error "is ground for granting a new trial [or] setting aside a verdict" unless "justice requires otherwise," and further, that "the court must disregard all errors and defects that do not affect any party's substantial rights." Consequently, if Defendants were entitled to qualified immunity, then a verdict in favor of Defendants did not affect Plaintiffs' substantial rights.
Because we hold that that the defendants were entitled to immunity and thus should not have had judgment entered against them, we do not analyze the issue in relation to the standard for a new trial.

- 16 -

v. Wesby, 138 S. Ct. 577, 589 (2018)).  Courts may analyze either part of the test first.  See id. at 584.

The "clearly established" inquiry itself has two elements.  The first is focused on whether the law was "'sufficiently clear' such that every 'reasonable official would understand that what he is doing' is unlawful."  Id. at 583 (alterations omitted) (quoting Wesby, 138 S. Ct. at 589).  Qualified immunity is supposed to "protect 'all but the plainly incompetent or those who knowingly violate the law.'"  Id. (alteration omitted) (quoting White v. Pauly, 137 S. Ct. 548, 551 (2017)).

Because of that, the right that was allegedly violated must be defined "in a particularized sense so that the contours of the right are clear to a reasonable official."  Id. (internal quotation marks omitted) (quoting Reichle v. Howards, 566 U.S. 658, 665 (2012)).  "[E]xisting precedent must have placed the statutory or constitutional question beyond debate."  Id. (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)).  In Eves v. LePage, this court sitting en banc found that the defendant was entitled to qualified immunity where "it is 'at least arguable'" that the defendant's actions were constitutional, id. (quoting Reichle, 566 U.S. at 669), and where "[t]here was no 'controlling authority' or even a 'consensus of cases of persuasive authority,'" id. at 584 (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999)).

- 17 -

The second element "focuses on the objective legal reasonableness of an official's acts," and "[e]vidence concerning the defendant's subjective intent is simply irrelevant." Id. at 583 (internal quotation marks and alteration omitted) (quoting Crawford-El v. Britton, 523 U.S. 574, 588, 590 (1998)). This element provides "some breathing room for a police officer even if he has made a mistake (albeit a reasonable one) about the lawfulness of his conduct." Gray v. Cummings, 917 F.3d 1, 10 (1st Cir. 2019) (quoting Conlogue v. Hamilton, 906 F.3d 150, 155 (1st Cir. 2018)).

B.    The Officers Are Entitled to Qualified Immunity Because Under the Community Caretaking Exception Their Entry Through the Open Door of the Home Did Not Violate Plaintiffs' Constitutional Rights

Edwards, Jean, and Kaplan are entitled to qualified immunity for entering Christopher's apartment under the first prong of the test for qualified immunity. See Eves, 927 F.3d at 584. The entry did not violate the Castagnas' constitutional rights because the officers were allowed to enter the apartment through the open door under the community caretaking exception to the warrant requirement.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. In general, "warrantless entries into a home 'are presumptively unreasonable.'" Morse v. Cloutier, 869 F.3d 16, 23

- 18 -

(1st Cir. 2017) (quoting <u>Payton</u> v. <u>New York</u>, 445 U.S. 573, 586 (1980)).

There are exceptions to the warrant requirement. One is the community caretaking exception, first described by the Supreme Court in <u>Cady</u> v. <u>Dombrowski</u>, 413 U.S. 433 (1973). In <u>Cady</u>, police officers searched a disabled car without a warrant because they believed that there was a gun in the car's trunk and the car was vulnerable to vandals. 413 U.S. at 448. The Court held that the search was constitutionally permissible because it was a reasonable exercise of the officers' "community caretaking functions," explaining that officers are often called on to act in ways "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." <u>Id.</u> at 441. This circuit has long applied the community caretaking exception described in <u>Cady</u> in the context of automobiles. <u>See, e.g.</u>, <u>United States</u> v. <u>Rodriguez-Morales</u>, 929 F.2d 780, 785 (1st Cir. 1991).

This year, after the district court in this case issued its decision, this court held that the community caretaking exception could be used to justify police officers' entry into homes as well. <u>Caniglia</u> v. <u>Strom</u>, 953 F.3d 112, 124 (1st Cir. 2020). Police are entitled to enter homes without a warrant if they are performing a community caretaking function and their actions are "within the realm of reason." <u>Id.</u> at 123 (quoting

- 19 -

Rodriguez-Morales, 929 F.2d at 786). We apply the analysis laid out in Caniglia and hold that the officers' entry was justified under the community caretaking exception to the warrant requirement.

When determining whether the officers' actions are protected by the community caretaking exception, we "look at the function performed by [the] police officer." Id. at 125 (quoting Matalon v. Hynnes, 806 F.3d 627, 634 (1st Cir. 2015)). The function performed must be "distinct from 'the normal work of criminal investigation'" to be within "the heartland of the community caretaking exception." Id. (quoting Matalon, 806 F.3d at 634-35). Actions within that heartland include actions taken to "aid those in distress, combat actual hazards, prevent potential hazards from materializing, and provide an infinite variety of services to preserve and protect community safety." Rodriguez-Morales, 929 F.2d at 784-85 (citing Wayne LaFave, Search and Seizure § 5.4(c) (2d ed. 1987)); see also Wayne LaFave, Search and Seizure § 5.4(c) (5th ed. 2012) (similar).

Here, the function being performed by Edwards, Jean, and Kaplan was a community caretaking one. When the officers arrived at the scene, they saw intoxicated guests who appeared to be underage entering and exiting a party freely through an open door. Jean saw a guest that looked underage leave the house, throw up twice outside, and then reenter the apartment. The party was loud

enough to be heard from the street. In their efforts to have the music turned down and make sure any underage guests were safe, they were aiding people who were potentially in distress, preventing hazards from materializing, and protecting community safety.

In determining whether the officers' actions are protected by the community caretaking exception, we also must "balance . . . the need for the caretaking activity and the affected individual[s'] interest in freedom from government intrusions" to determine if the officers' actions were reasonable.[10] Caniglia, 953 F.3d at 125.

The officers acted reasonably. The officers had an implicit invitation to go up on the porch and knock on the apartment's door. See Florida v. Jardines, 569 U.S. 1, 8 (2013). The officers did not enter the home until announcing themselves and failing to get the guests' attention. They needed to get the attention of the homeowner because he is the person ultimately responsible for the impact of the party on the neighborhood. Because they were responding to a 911 call reporting a noise

---

[10] In Caniglia, this court declined to decide whether probable cause or merely reasonableness was necessary to seize the plaintiff under the community caretaking exception, noting that the standard in that case might be higher because it is "of a greater magnitude than classic community caretaking functions like vehicle impoundment." Caniglia, 953 F.3d at 127. In this appeal, we apply our traditional reasonableness test.

- 21 -

complaint, the officers knew that people in the neighborhood were disturbed by the party. In addition, underage drinkers pose a safety risk. This is especially true on a holiday known for drinking and one that requires extra police officers to be deployed throughout the city.

Given the open front door, the people coming in and out of that open door at will, the evident lack of supervision by the owner of who entered, and the owner's failure to respond, any expectation of privacy was greatly diminished. It was objectively reasonable for an officer to have on-going concerns about noise complaints and underage drinking and determine that they might be easily resolved by entering through an open door (the same one the guests were coming and going through freely) to bring these complaints to the owner's attention.[11]

The officers' actions do not implicate any of the "limitations" on the community caretaking doctrine. Caniglia, 953 F.3d at 126. Nothing the officers said or did reasonably raises the possibility that they were relying on concerns about the noisy,

---

[11]    In a 28(j) letter, the plaintiffs argue that Caniglia allows warrantless entry into homes under the community caretaking exception only when there is immediate danger. Not so. Caniglia happened to implicate the specific community caretaking function of trying to prevent someone in a state of crisis from using firearms. 953 F.3d at 125. That serious risk of harm was balanced against relatively serious government incursions on the individual's personal freedoms. Id. Police officers perform a variety of functions when in their community caretaking role, not all of which must implicate a risk of imminent harm.

open, and unsupervised party as "a mere subterfuge for investigation" of a crime. Id. (quoting Rodriguez-Morales, 929 F.2d at 787). Even if they had been motivated in part to enforce underage drinking laws, for example, "the possible existence of mixed motives will not defeat the officer's . . . entitlement to the exception." Matalon, 806 F.3d at 635; see also Caniglia, 953 F.3d at 128 (applying the community caretaking exception where the plaintiff was "imminently dangerous" to others and thus had the potential to commit a criminal offense).

The officers were able to give "specific articulable facts," Caniglia, 953 F.3d at 126 (quoting United States v. King, 990 F.2d 1552, 1560 (10th Cir. 1993)), to show their actions were "justified on objective grounds," id. (quoting Rodriguez-Morales, 929 F.2d at 787). They were able to describe specific observations about the party, its effect on the neighborhood, and their reasons for being concerned about at least some of the guests' safety. They could articulate why it was necessary to enter the home to talk to the homeowner when they could not get anyone's attention from outside of the house. The plaintiffs try to undermine this by arguing that the officers' actions, such as not immediately searching out the vomiting teenager, for example, show a subjective lack of concern for the party guests' safety. But the proper test is objective, and people who are below the legal drinking age and apparently sick from alcohol are an objective safety risk.

Further, the officers' actions "dr[e]w their essence" from "sound police procedure." Id. (citing Rodriguez-Morales, 929 F.2d at 785). As said in Caniglia, "sound police procedure" is defined "broadly and in practical terms." Id. The definition "encompasses police officers' 'reasonable choices' among available options." Id. (quoting Rodriguez-Morales, 929 F.2d at 787). There is no requirement that the officers had to have waited for a longer period outside the door, for example, in the hopes that someone eventually would hear them and fetch the owners without them ever entering the home. There is "no requirement that officers must select the least intrusive means of fulfilling community caretaking responsibilities." Id. (quoting Lockhart-Bembery v. Sauro, 498 F.3d 69, 76 (1st Cir. 2007)).

C. The Officers Are Entitled to Qualified Immunity Because in 2013 the Law Was Not Clearly Established that Entering the Home Was Unconstitutional Under the Community Caretaking Exception

The officers are entitled to qualified immunity under the second prong of the qualified immunity test as well. See Eves, 927 F.3d at 584. In 2013, there was no clearly established law that the officers' entrance into the apartment fell outside of the scope of the community caretaking exception.

As said, this circuit had not explicitly held until this year that the community caretaking exception could be applied to homes. Before 2013, some circuits had held that Cady's community caretaking exception applies only to automobiles, not homes. See

- 24 -

Ray v. Twp. of Warren, 626 F.3d 170, 176-77 (3d Cir. 2010) (collecting cases). But three other circuits before that date had applied the exception to homes as well as automobiles. See United States v. Quezada, 448 F.3d 1005, 1007 (8th Cir. 2006); United States v. Rohrig, 98 F.3d 1506, 1520-23 (6th Cir. 1996);[12] United States v. York, 895 F.2d 1026, 1029-30 (5th Cir. 1990). And neither the First Circuit nor the Supreme Court had held that the exception was limited to automobiles. In Lockhart-Bembery, this circuit did not limit the exception's application to the mere search of a car; it upheld an order by police officers to move a car off the side of a public road for safety reasons. 498 F.3d at 75-77.

There was no consensus of persuasive authority at the time of the officers' entry that the community caretaking exception could only apply to automobile searches. We reached the same conclusion in MacDonald v. Town of Eastham, 745 F.3d 8 (1st Cir. 2014), an opinion that post-dates the Castagnas' party by a year but relies on precedents that all pre-date the party. In MacDonald, this court explained that "the scope and boundaries of

---

[12]    The Sixth Circuit wrote about "exigent circumstances" as well as community caretaking, but we still understand this case as applying a version of the community caretaking exception. As we discussed in MacDonald v. Town of Eastham, 745 F.3d 8 (1st Cir. 2014), "courts do not always draw fine lines between the community caretaking exception and other exceptions to the warrant requirement." Id. at 13.

the community caretaking exception [were] nebulous [in 2014]," but precisely because of this legal uncertainty, the court determined that the law was not clearly established that community caretaking could not apply to searches of a home.  Id. at 14.

Nor was there a consensus of authority in 2013 that the specific circumstances surrounding the officers' entry into Christopher's apartment made their entry an unreasonable application of the community caretaking doctrine.  This circuit's pre-2013 community caretaking decisions had established a framework for when the exception might apply to officers' searches. These decisions were the basis for the law applied in Caniglia.

The community caretaking exception is a recognition that

> [t]he policeman plays a rather special role in
> our society; in addition to being an enforcer
> of the criminal law, he is a "jack-of-all-
> emergencies," W. LaFave, Search and Seizure
> § 5.4(c) (2d ed. 1987), expected to aid those
> in distress, combat actual hazards, prevent
> potential hazards from materializing, and
> provide an infinite variety  of services to
> preserve and protect community safety. . . .
> The rubric is a catchall for the wide range of
> responsibilities that police officers must
> discharge aside from their criminal
> enforcement activities.

Rodriguez-Morales, 929 F.2d at 784-85.

> The imperatives of the Fourth Amendment are
> satisfied in connection with the performance
> of non-investigatory duties, including
> community caretaking tasks, so long as the
> procedure involved and its implementation are
> reasonable.  [Rodriguez-Morales, 929 F.3d at
> 785.]  The community caretaking doctrine gives

- 26 -

officers a great deal of flexibility in how they carry out their community caretaking function. See id. The ultimate inquiry is whether, under the circumstances, the officer acted "within the realm of reason." Id. at 786. Reasonableness does not depend on any particular factor; the court must take into account the various facts of the case at hand.

Lockhart-Bembery, 498 F.3d at 75 (some citations omitted). In 2013, like today, "[t]here [was] no requirement that officers must select the least intrusive means of fulfilling community caretaking responsibilities." Id. at 76.

The officers in 2013 also could have looked to other circuits that had had applied the community caretaking exception to warrantless entries into homes in circumstances analogous to this case. The Sixth Circuit, in Rohrig, held that police officers were permitted to enter a home without a warrant to search for the homeowner where they were responding to a noise complaint, knocked on the door and received no response, the door was open, and the officers announced their presence. 98 F.3d at 1509. The court understood this entry as an example of the officers exercising their "community caretaking functions," id. at 1521 (citing Cady, 413 U.S. at 441), and said that their actions were reasonable "because nothing in the Fourth Amendment requires us to set aside our common sense," id.

Similarly, in York, the Fifth Circuit held that the community caretaking exception applied to officers' entry into a

home when they were protecting guests who were removing their belongings from the house of a host who had become abusive and threatening. 895 F.2d at 1029-30. The court in York found it relevant that the host was exhibiting drunken behavior and was posing a risk of harm to others. Id. at 1030.

The Eighth Circuit, in an opinion by Judge Arnold, affirmed the denial of a motion to suppress evidence, holding that the community caretaking exception provided the police officer with a lawful basis for entering a home. Quezada, 448 F.3d at 1007-08. In that case, an officer attempting to serve a child protection order became concerned that the homeowner was in the house but somehow unable to respond. Id. at 1008. He knocked on the apartment door, which swung open on his knocking, and announced himself by yelling into the apartment several times. Id. at 1006. When he heard no response, he entered the home. Id.

Given this legal background, the officers could not have been on notice that their actions would clearly violate the Castagnas' constitutional rights. The officers testified that they were not intending to arrest anyone at the party; as in Rohrig, they merely wanted to make sure the music was turned down so it would stop disturbing the neighbors. As in York, they were concerned with mitigating the risk of harm of excessive drunkenness. Like the officer in Quezada, the police officers here knocked on the door and announced themselves before entering.

Their actions were at least arguably within the scope of the community caretaking exception. And for many of the same reasons discussed earlier in the opinion, their actions were at least arguably reasonable under the law in 2013.

As this circuit held in MacDonald, a similar case in which officers announced their presence at an open door, received no reply, and entered a home without a warrant, "neither the general dimensions of the community caretaking exception nor the case law addressing the application of that exception provides the sort of red flag that would have semaphored to reasonable police officers that their entry into the plaintiff's home was illegal." 745 F.3d at 15. "Qualified immunity is meant to protect government officials where no such red flags are flying, and we discern no error in the application of the doctrine to this case." Id. (citation omitted).

D. Plaintiffs Waived the Argument that the Officers Violated Their Rights by Remaining in the House After the Music Was Turned Off

We briefly address the claim that the officers are separately liable for violating the Castagnas' constitutional rights, not only by entering the apartment originally, but by remaining in the apartment after the music was turned off and going toward the bedroom to look for the homeowner.[13] Although the

---

[13] The testimony taken in the light most favorable to the defendants shows that the officers knocked on the bedroom door and

officers' decision to remain in the apartment is more problematic than their decision to enter the apartment originally, the Castagnas have waived the argument that this is a separate violation of their rights.

The argument that there are two separately actionable Fourth Amendment claims in this case was made in the district court, but in its new trial order, the district court did not analyze the unlawful entry claim that way. The plaintiffs did not take a cross-appeal from the ruling that the entry into the bedroom claim was not independent of the entry into the home claim.

Regardless, the argument is waived for lack of developed argument on appeal. The plaintiffs' statement of issues only discusses the claim about the initial unlawful entry into the home.[14] The only legal support provided by the plaintiffs for their contention that these should be analyzed as separate claims are two inapposite district court opinions. See Barbosa v. Hyland,

---

Christopher answered it. When Christopher saw Jean looking at the marijuana in his bedroom, he intentionally slammed the door on Jean's foot. Once he did that, Jean would have been entitled to enter the bedroom to arrest Christopher.

[14] Plaintiffs' briefing suggests there are potentially two actionable claims where they argue in the alternative that "[a]ssuming arguendo that Defendants' initial minimal entry was permissible for the purpose of gaining the attention of the guests, they could go no further after doing so" because "they had accomplished their goal" of turning off the music and were not trying to help the teenager who had twice vomited outside.

No. 11-11997-JGD, 2013 WL 6244157 (D. Mass. Dec. 2, 2013); Walker v. Jackson, 952 F. Supp. 2d 343 (D. Mass. 2013).[15]  Arguments made perfunctorily and without developed argumentation are waived. See, e.g., Jordan v. Town of Waldoboro, 943 F.3d 532, 546-47 (1st Cir. 2019) (citing Zannino, 895 F.2d at 17).

### III.

We reverse the judgment for the Castagnas and remand for the district court to enter judgment for Edwards, Jean, and Kaplan.

---

[15]  Walker discussed the emergency aid exception, not the community caretaking exception.  The district court in Walker found that an officer who searched the home after two other officers had already completed a search was not covered by the exception.  952 F. Supp. 2d at 349-50.  In Barbosa, the district court specified that the officers "did not enter or remain in the house for any reasons supported by the community caretaking doctrine," but both aspects of the claim are analyzed together.  2013 WL 6244157, at *7-9.