# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-3512
_____

Jon Luer; Andrea Steinebach

*Plaintiffs - Appellees*

v.

Michael Clinton; Benjamin Selz

*Defendants - Appellants*
_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis
_____

Submitted: September 25, 2019
Filed: February 16, 2021
[Published]
_____

Before LOKEN, COLLOTON, and KOBES, Circuit Judges.
_____

PER CURIAM.

Husband Jon Luer and wife Andrea Steinebach sued St. Louis County police officers Michael Clinton and Benjamin Selz after Luer found the officers, guns drawn, searching their home without a warrant at 3:00 a.m. Ruling on cross motions for summary judgment, the district court denied the officers qualified immunity and granted Luer and Steinebach partial summary judgment on their claims that the

officers unlawfully entered and searched their home and its curtilage, concluding the circumstances were insufficient to create an exception to the Fourth Amendment's warrant requirement. The officers timely appealed. We have jurisdiction over the denial of their claims of qualified immunity under the collateral order doctrine and the grant of partial summary judgment when it raises the same Fourth Amendment issues. Sherbrooke v. City of Pelican Rapids, 513 F.3d 809, 813 (8th Cir. 2008). We conclude the officers are entitled to qualified immunity for some but not all their actions on the night in question. Therefore, we affirm in part, reverse in part, and remand for further proceedings not inconsistent with this opinion.

I.

In the early hours of a Sunday morning, a drunk man took a taxi from downtown St. Louis to Luer and Steinebach's neighborhood in Ballwin, Missouri. The taxi stopped on the street near their house. The intoxicated rider exited the taxi explaining that he needed to fetch some money. He never returned. When the taxi driver realized he had been stiffed on the $65 fare, he called police at 2:38 a.m.

The officers arrived at 2:45 a.m. The driver told Officer Clinton that "a white male wearing a white hat in his mid 30s" ran off and pointed in a general direction away from Luer and Steinebach's home. Clinton Dep., D. Ct. Dkt. 67–4 at 50:14–23. Officer Clinton immediately went in that direction -- between the house adjacent to Luer and Steinebach's house and the house two doors down. He passed between the houses and checked both backyards. Using a flashlight, he searched "[u]nderneath the back porch of the neighbor's residence," around the air conditioning unit, and behind trees and shrubs where someone could hide. Id. at 54:9–56:1. Officer Clinton found no sign of the fare skipper and crossed back across the neighbor's yard, entered Luer and Steinebach's backyard, and then proceeded onto a private garden pathway on the side of their home that connected to the driveway. When on the pathway, Officer Clinton noticed a side entry to the attached garage was not fully secured: it

is disputed whether the transparent outer storm door was closed or slightly ajar; the door leading into the garage was open. This doorway is not visible from the street.

At that point, Officer Selz joined Officer Clinton and they approached Luer and Steinebach's front door. They knocked on the door and windows and rang the doorbell. The house remained quiet, so the officers walked around the house to the backyard patio and knocked on the sliding glass door. Receiving no response, the Officers returned to the side garage entrance. At 2:55 a.m., they told dispatch to hold the channel because they saw an open door behind the storm door and then entered the garage. Once inside the garage, the officers discovered that the door leading into the kitchen from the garage was open two to four inches. They fully opened it and entered the house with their guns drawn. The officers headed toward a light coming from the basement, but returned to the main level after encountering a locked door. They continued searching the home until they encountered Luer, partially dressed, outside his bedroom.

Luer identified himself as the homeowner and said that his wife, Steinebach, and step-son were home. The officers asked about his step-son, who then joined them in the hallway. The three dressed and went outside where the taxi driver identified the step-son as the fare skipper. Luer consented to a search of his step-son's bedroom to look for a white hat. The officers did not find a hat, and a sobriety test indicated that Luer's step-son was not intoxicated. After the officers decided that he was not the suspect, they left. This lawsuit followed.

II.

We review the grant or denial of summary judgment *de novo*. <u>Zubrod v. Hoch</u>, 907 F.3d 568, 575 (8th Cir. 2018). Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The officers do not claim there are disputed

material facts that prevent partial summary judgment for Luer and Steinebach, only that they are entitled to qualified immunity as a matter of law.

Qualified immunity protects officers from civil damages "so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Mullenix v. Luna, 577 U.S. 7, 11 (2015) (per curiam) (citation omitted). To succeed, Luer and Steinebach must show that officers Clinton and Selz violated a constitutional right that was "clearly established" at the time of their alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 232 (2009). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent" so that "every reasonable official would understand what he is doing is unlawful." Dist. of Columbia v. Wesby, 138 S. Ct. 577, 589-90 (2018) (cleaned up). Existing precedent must place the unlawfulness of the police officer conduct at issue "beyond debate." Id. at 590 (quotation omitted); see White v. Pauly, 137 S. Ct. 548, 551 (2017).

The Fourth Amendment protects the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." "At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Kyllo v. United States, 533 U.S. 27, 31 (2001). "Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Payton v. New York, 445 U.S. 573, 590 (1980). The area "immediately surrounding and associated with the home -- what our cases call the curtilage – is part of the home itself for Fourth Amendment purposes." Florida v. Jardines, 569 U.S. 1, 6 (2013) (citations omitted). But a limited warrantless intrusion into the curtilage is not unreasonable when there is a legitimate law enforcement objective "unconnected with a search directed against the accused." United States v. Robbins, 682 F.3d 1111, 1115 (8th Cir. 2012) (quotation omitted), cert. denied, 569 U.S. 905 (2013).

-4-

Because the ultimate Fourth Amendment touchstone is reasonableness, the warrant requirement is subject to certain exceptions. See Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006). The district court considered three well-established exigent circumstances in concluding Officers Clinton and Selz violated the Fourth Amendment -- when police provide "emergency assistance to an injured occupant," are "in hot pursuit of a fleeing suspect," or "need to prevent the imminent destruction of evidence." Kentucky v. King, 563 U.S. 452, 459 (2011). The court did not consider another recognized exception to the warrant requirement -- the community caretaker exception first announced in Cady v. Dombrowski, 413 U.S. 433 (1973). "Our circuit has recognized, under the 'community caretaker' classification, that noninvestigatory searches and seizures may be justified in certain limited situations." United States v. Harris, 747 F.3d 1013, 1017 (8th Cir.) (citations omitted), cert. denied, 574 U.S. 910 (2014).[1]

"Actions within [the] heartland of the community caretaker exception includes those taken to . . . provide an infinite variety of services to preserve and protect community safety." Castagna v. Jean, 955 F.3d 211, 221 (1st Cir.) (quotation omitted), cert. denied, 2020 WL 7132271 (Dec. 7, 2020). They "rang[e] from helping little children to cross busy streets to navigating the sometimes stormy seas of neighborhood disturbances." Caniglia v. Strom, 953 F.3d 112, 118 (1st Cir.), cert. granted, No. 20-157, 2020 WL 6811250 (Nov. 20, 2020). For example, the community caretaking exception has been applied when police officers reasonably

[1]Although the phrase "community caretaking" first appears in the reply brief on appeal, the opening brief cites Mincey v. Arizona, 437 U.S. 385, 392 (1978), and refers to the law enforcement function of protecting occupants of a home from imminent injury. This court has cited that aspect of Mincey as an example of the community caretaking function, see United States v. Quezada, 448 F.3d 1005, 1007 (8th Cir. 2006), and we conclude that the issue is fairly presented. See also MacDonald v. Town of Eastham, 745 F.3d 8, 13 (1st Cir. 2014) (observing that "courts do not always draw fine lines between the community caretaking exception and other exceptions to the warrant requirement").

entered a home to abate a nuisance, such as loud music creating a late night disturbance of the peace. See United States v. Rohrig, 98 F.3d 1506, 1520-22 (6th Cir. 1996). An officer's warrantless intrusion into the home or curtilage must be "limited in scope to the extent necessary to carry out the caretaking function." South Dakota v. Opperman, 428 U.S. 364, 375 (1976). "The fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." Cady, 413 at 448.[2]

Clinton and Selz first entered the curtilage and then the home of Luer and Steinebach. We begin with the curtilage issue. Unfortunately, the parties and the district court have not defined the parameters of this curtilage. It obviously included the attached garage. The parties seem to assume, not unreasonably,[3] that it also included Luer and Steinebach's back yard, the sliding glass door on the backyard patio, and the pathway and driveway leading from the back yard to the street alongside the neighboring residence. Because these areas present different Fourth Amendment issues than the subsequent entry into the Luer-Steinebach home, we begin our analysis with the first action Officer Clinton took after talking to the cab driver -- he walked where the cab driver said the fare-skipper fled, between the house adjacent to Luer and Steinebach's and the house two doors down, and then checked the neighbor's backyard and porch with a flashlight. Did this action violate the neighbor's Fourth Amendment expectation of privacy in his or her curtilage?

---

[2]Cady and Opperman applied the community caretaking exception to searches of vehicles, where Fourth Amendment protections are more limited. Like most circuits, we have extended the exception to entry into a residence or curtilage "when the officer has a reasonable belief that an emergency exists requiring his or her attention." Burke v. Sullivan, 677 F.3d 367, 371 (8th Cir. 2012) (quotation omitted); see United States v. Smith, 820 F.3d 356, 362 (8th Cir. 2016).

[3]See United States v. Wells, 648 F.3d 671, 676-79 (8th Cir. 2011), noting that whether the curtilage determination is reviewed *de novo* or for clear error is in doubt in this circuit.

The Supreme Court has not addressed a curtilage issue in similar circumstances. Officer Clinton was looking for a thief; he arguably had reasonable suspicion justifying a Terry stop and brief questioning. But given the passage of time since the fare-skipper fled from the cab driver, Clinton was not in "immediate or continuous pursuit" of a suspect that justifies warrantless entry into a home under the "hot pursuit" class of exigent circumstances. See Welsh v. Wisconsin, 466 U.S. 740, 753 (1984). On the other hand, Clinton did not enter the neighbor's home, only its curtilage, and he made only a limited search of outdoor places where the thief might be hiding, not a search inside the home from the vantage point of its curtilage. Doing a "sweep" of the area where the cab driver said an intoxicated thief had fled was arguably a reasonable exercise of Clinton's community caretaker function "to preserve and protect community safety."[4] Clinton and later Selz were in part motivated by their duty to investigate a reported petty theft, but "mixed motives will not defeat" their entitlement to the community caretaker exception. Castagna, 955 F.3d at 222. For example, had the cab driver been paid and then called the police to ensure that his inebriated passenger got home safely without disturbing the neighborhood, the officers would no doubt have taken the same actions to preserve and protect community peace and quiet, the surrounding residential properties, and the passenger's safety.

To posit what may be a more common situation, suppose a nearby resident had called 911 to report that a prowler in the neighbor's walkway and back yard was

---

[4]Focusing only on the typical use of the term protective sweep -- "as an adjunct to the serious step of taking a person into custody for the purposes of prosecuting him for a crime," Maryland v. Buie, 494 U.S. 325, 333 (1990) -- the district court rejected the officers' contention that they made a constitutionally valid protective sweep because no arrest occurred on the night at issue. But this was not a protective sweep incident to an arrest or Terry stop. It was a protective sweep of a neighborhood for complained-of community hazards, not unlike an inspection for outdoor property hazards.

acting like he might be about to burgle the premises. Officer Clinton is dispatched and does the same investigation, but when he shines his flashlight under the neighbor's back porch, he sees drug and firearm contraband in plain view. Given the dearth of precedent addressing this curtilage issue, we think Clinton would deserve qualified immunity if the neighbor then brought a § 1983 damage action. See MacDonald, 745 F.3d at 13-15. As the Ninth Circuit said in United States v. Struckman, "the fact that the police officers went to the house in response to Ms. Grime's 911 report to look around the area and, perhaps, ask questions was consistent with what citizens expect from law enforcement -- efforts to assure that they and their property are safe from unlawful, injurious acts by others." 603 F.3d 731, 741 (9th Cir. 2010); see generally 3 Wayne R. LaFave, Search and Seizure § 6.6(c) (6th ed. 2020). Citizens also may expect law enforcement to enter curtilage under limited circumstances to protect persons or property.

Officer Clinton did not end his sweep with the neighbor's property. He did not find the fare-skipper after looking for two-minutes in the neighbor's walkway, back yard, and under the back porch. He then looked briefly in Luer and Steinebach's neighboring back yard and walked down their pathway and driveway that ran along the other side of the neighbor's residence to the street. In our view, the community caretaker purpose that made his entry into the neighbor's walkway and backyard objectively reasonable likewise applies to this extension of his sweep to the exterior curtilage of the immediately adjacent residence. The community caretaker exception does not apply where a "law enforcement officer physically intrudes on the curtilage *to gather evidence*" of a crime. Collins v. Virginia, 138 S. Ct. 1663, 1670 (2018) (emphasis added). But here, the entry into their curtilage was entirely noninvestigative as to Luer and Steinebach.

At this point, the incident acquired a much different focus. Officer Clinton testified that when he walked down the flagstone path and approached the Luer-Steinebach driveway, he saw that the inner door into their attached garage -- a

-8-

doorway not visible from the street -- was open, an unusual and ominous condition at 3:00 a.m. that suggested the fare-skipper may be hiding in the garage. Officer Selz joined Clinton, and the two officers knocked on the front door and windows, rang the doorbell, walked around the house to the back patio, and knocked on the sliding glass door. Receiving no response, they went back to the open door and entered the garage, the last portion of curtilage at issue, where they found no hiding fare-skipper.

Though a closer question, we conclude that this, too, was arguably a reasonable exercise of their community caretaker function. The officers had reason to believe an intoxicated thief was in the vicinity, and an open garage door was a likely place where he could enter and perhaps damage property. As the Sixth Circuit observed in Taylor v. Michigan Department of Natural Resources, "this was a situation where a common sense assessment would be that a legitimate owner, could that person have been contacted, would want the officers to investigate the possible break in, which tips us in the direction of finding the officer's actions reasonable." 502 F.3d 452, 457-58 (6th Cir. 2007) (cleaned up). Given the dearth of relevant prior judicial authority, we conclude the officers are entitled to qualified immunity for their entry into this area of the curtilage as well. See Castagna, 955 F.3d at 224 ("[T]he officers could not have been on notice that their actions would clearly violate the [homeowners'] constitutional rights.").

That brings us to the most consequential actions at issue: the officers' entry into and extensive search of the Luer-Steinebach home, ending with a frightening confrontation with the awakened family. The officers found no one in the attached garage but observed that the door from the garage into the kitchen of the home was ajar. They knocked, announced police, entered the kitchen with guns drawn, and made "loud verbal commands" that anyone in the house "make themselves known." Up to this point, we conclude that the officers are entitled to qualified immunity under the community caretaker exception because an open door into a home late at night, when no one had responded to their repeated knocking at the outside doors,

arguably warranted a limited protective entry. However, even if their intrusions to this point were justified, we must assess whether they sufficiently tailored their subsequent activity to this limited purpose. See Smith, 820 F.3d at 362; United States v. Goldenstein, 456 F.2d 1006, 1010 (8th Cir. 1972).

No one responded to the officers' repeated announcing at the kitchen door threshold. From there, they saw a light emanating from an open door to the basement. They descended to the basement, found no signs of disturbance, returned to the main level, and continued searching the entire home until encountering Luer outside his bedroom. We conclude the community caretaker exception cannot justify this severe, warrantless intrusion into a home. In searching two yards, underneath a deck, behind an air conditioning vent, and in the Luer-Steinebach attached garage, Officer Clinton observed no sign of the intoxicated fare-skipper. The officers had no information the suspect was armed or otherwise dangerous. They got no response from inside the Luer-Steinebach home and saw no signs of criminal activity. The cab driver reported that a petty thief had run, not that a burglar was on the prowl in a residential neighborhood. Reasonable police officers acting as community caretakers should have left the home.

Whether the community caretaker exception extends to entries into the home is not a resolved Fourth Amendment question, as the recent grant of certiorari in the First Circuit's Caniglia decision demonstrates. The First Circuit recognized that the need to limit the extent of this exception "is especially pronounced in cases involving warrantless entries into the home. . . . [P]olice officers must have 'solid, noninvestigatory reasons' for engaging in community caretaking activities." Caniglia, 953 F.3d at 126 (quotation omitted).

The other "exigent circumstance" exceptions to the Fourth Amendment warrant requirement do not apply in these circumstances. The officers were not in "hot pursuit" of the intoxicated fare-skipper, and they had no information suggesting that

-10-

he was armed and dangerous. The officers argue that, because of the open doors, they had a "reasonable belief that the occupants of the [home] may be under a threat to their safety." Of course, there *may* be a threat to safety in almost any situation. However, it is clearly established that "[s]omething more than a speculative hunch is needed for police to conduct a protective sweep." United States v. Anderson, 688 F.3d 339, 346 (8th Cir. 2012), cert. denied, 568 U.S. 1182 (2013). Nor did the officers have information suggesting that anyone in the home was in need of emergency assistance. Had they confronted a person dressed as the cab driver described the fare-skipper *in a place where the officers were entitled to be*, they may well have had reasonable suspicion to stop and question the person and perhaps take him a short distance to see if the cab driver would identify him as the fare-skipper. But they were not entitled to enter and conduct an extensive search of the Luer-Steinebach home for this purpose without a warrant or consent. "[A]pplication of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense . . . has been committed." Welsh, 466 U.S. at 753.

Our factually most similar prior decision is United States v. Selberg, 630 F.2d 1292 (8th Cir. 1980). Selberg asked a neighbor to watch his mobile home for suspicious activity because of recent thefts and vandalism. Selberg left his front door open one day with the aluminum storm door closed. When the door was still open the next morning, the neighbor's wife called the police. Officer Ham responded. She explained the situation and asked him to check Selberg's home. Ham knocked and identified himself at Selberg's front door. Hearing no response, he entered the home without a warrant, immediately seeing a handgun on the living room floor. He then knocked on a closed door adjacent to the living room, entered when there was no response, and found an unregistered sawed-off rifle on a bedroom floor. Charged with possession of the second gun, Selberg moved to suppress. The district court denied the motion but our divided panel reversed, concluding (i) the neighbor's wife,

a third party, did not have common authority or control to consent to the entry, and (ii) exigent circumstances did not justify the warrantless entry because:

> Even if it might be said that these circumstances justified entry to determine whether there was any disturbance, they do not justify intrusions into areas behind closed doors, where the apparent expectation of privacy would be higher than in the area immediately inside the front door which Selberg had left open. A cursory look at the living room and kitchen could have satisfied the officer that there was no sign of disturbance and eliminated any fear there was an emergency threat to Selberg's property.

Id. at 1296. Here, as in Selberg, Officers Clinton and Selz encountered no signs of disturbance outside the Luer-Steinebach home or in their attached garage. Nothing suggesting imminent danger to persons or property was visible from the kitchen door threshold. Although Selberg did not use the phrase "community caretaking," the opinion in substance addressed whether an interest in community caretaking -- that is, protection of persons or property -- justified the entry, id. at 1295, and the case is nearly on point factually. Considering Selberg together with the Supreme Court's frequent cautions that exigent circumstances rarely justify a warrantless home intrusion, we conclude that it was clearly established by controlling Fourth Amendment precedents that the officers' full blown search of the entire Luer-Steinebach domicile without a warrant was objectively unreasonable.

For the foregoing reasons, the judgment of the district court is reversed in part and the case is remanded for further proceedings not inconsistent with this opinion.

KOBES, Circuit Judge, concurring in part and dissenting in part.

The majority wrestles with the outer limits of community caretaking. Those are hard questions—but they are questions we need not answer. Community

-12-

caretaking was not raised in the district court and was only discussed here in a reply brief.  It was waived.  See Eagle Tech. v. Expander Americas, Inc., 783 F.3d 1131, 1138 (8th Cir. 2015) (citation omitted) ("It is well settled that we will not consider an argument raised for the first time on appeal."); United States ex rel. Ambrosecchia v. Paddock Labs., LLC, 855 F.3d 949, 954 (8th Cir. 2017) ("[c]laims not raised in an opening brief are deemed waived") (citation omitted).

Even if the exception was properly raised, no facts support a reasonable belief that the officers needed to enter Luer and Steinebach's property to protect community safety.  The cab driver told Officers Clinton and Selz that the fare skipper walked away from Luer and Steinebach's home, and the officers "had no information the suspect was armed or otherwise dangerous."  Maj. Op. 10.  The cab driver reported only "that a petty thief had run, not that a burglar was on the prowl in a residential neighborhood."  Id.  On these undisputed facts, I do not think this is one of the "certain limited situations" where community caretaking justifies "a noninvestigatory search[]."  United States v. Harris, 747 F.3d 1013, 1017 (8th Cir.), cert. denied, 574 U.S. 910 (2014).

Officers Clinton and Selz raised only two exigent circumstances—hot pursuit and emergency aid.  The majority correctly rejects both arguments, and I would affirm on those grounds.  To the extent the majority's opinion grants immunity to the officers, I respectfully dissent.

_____